AVC NEDERLAND B.V.,
Plaintiff-Appellant,

v.

ATRIUM INVESTMENT PARTNERSHIP, Pieter Kuik and Robert K. Lenting, Defendants-Appellees.

No. 1444, Docket 84–7305.

United States Court of Appeals,
Second Circuit.

Argued June 11, 1984.
Decided July 19, 1984.

---

**14.** *See* footnote 2.

James M. Brachman, New York City (Freeman, Wasserman & Schneider, New York City), for plaintiff-appellant.

Thomas B. Branch, III, Atlanta, Ga. (Wildman, Harrold, Allen, Dixon & Branch, Atlanta, Ga. (Brian N. Smiley, Atlanta, Ga., of counsel), and Meltzer, Lippe & Goldstein, P.C., Mineola, N.Y. (Alan L. Mittman, New York City, of counsel)), for defendants-appellees.

Before FRIENDLY, VAN GRAAFEILAND and WINTER, Circuit Judges.

FRIENDLY, Circuit Judge:

The issues on this appeal from an order of the District Court for the Eastern District of New York dismissing an action under § 10(b) of the Securities Exchange Act and the SEC's Rule 10b–5 are whether the complaint alleged a claim within that court's subject-matter jurisdiction and, if so, whether the court properly dismissed the action because of an agreement of the parties that disputes between them should be decided by the competent court at Utrecht in the Netherlands in accordance with Dutch law. We answer both questions in the affirmative and therefore affirm the order of the district court.

The facts, gleaned from numerous affidavits and documents submitted in support of and in opposition to defendants' motion to dismiss, taken in the light most favorable to plaintiff as they must be, *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1330 (2 Cir.1972), are as follows:

Plaintiff AVC Nederland B.V. ("AVC") is a Dutch corporation that imports recording tapes and cassettes into the Netherlands and sells them to retailers in that country. Peter J. Haan, a Dutch citizen and resident, is its managing director and sole shareholder. Defendants Pieter Kuik and Robert K. Lenting are also Dutch citizens and residents; Lenting had been Haan's insurance broker since the early 1970's. Defendant Atrium Investment Partnership ("Atrium") is a general partnership formed in Georgia by Kuik and Lenting in July, 1981; the objective was to purchase the Atrium building in Great Neck, Nassau County, New York, and sell shares in the partnership to citizens and residents of foreign countries.

For some years Kuik and Lenting had been studying the American real property market with a view to developing opportunities attractive to European investors. To

that end they had formed a company in Atlanta, Georgia, called K & L Advisory Company ("K & L") and had retained an Atlanta law firm as counsel.[1]

In August 1981, at the instigation of Henk van Gaalen, AVC's financial auditor and representative, Lenting met in Holland with Haan and van Gaalen to discuss AVC's participation in Atrium. Haan claims that Lenting told him that Lenting and Kuik had paid $18 million for the Atrium building, including a $10 million dollar mortgage held by an American insurance company. Lenting gave Haan a copy of a lengthy brochure concerning the building and the partnership. This was in Dutch and had been prepared by Wisselink B.V., a firm of Dutch tax advisers, at the request of Lenting and Kuik. The brochure referred to the formation of the Atrium Investment Partnership, which would have "(total net worth invested, including the existing mortgage, of approximately $18 million), of which the equity will amount to $10 million." (Haan's translation).[2] Lenting urged Haan to inspect the building before deciding whether to invest.

Haan came to New York City in November 1981. Kuik and Lenting showed him the Atrium building, as well as another building in Lake Success on Long Island, which they had bought for a different partnership, and other real estate ventures in Washington, D.C., Baltimore and Atlanta. Discussions were had at K & L's offices in Atlanta. Haan claims that all the misrep-

resentations alleged in the complaint[3] were stated to him by Kuik and Lenting in the United States. More specifically he avers that Kuik and Lenting repeated in Great Neck that the Atrium Building had cost $18,000,000, and that they stated in Atlanta that Atrium's total equity in the building was approximately $10,000,000 and that AVC's cost per unit of equity in the partnership would be the same as Kuik's and Lenting's. During the meeting Lenting also drafted an outline of the terms on which AVC would become a 40% member of Atrium by paying the partnership $3,800,000.[4] Although plaintiff makes frequent reference to the delivery of this outline in Atlanta, the only representation is a statement that "[t]he first four quarters cash flow at an annual basis of U.S. $280,000 shall be paid to K & L Advisory Group," which is not alleged as a misrepresentation in the complaint. Admittedly nothing was concluded in Atlanta.

Discussions were resumed in the Netherlands on November 27, 1981. Haan described the meeting as follows:

> Mr. Lenting spoke in terms of units costing $380,000 each. I informed him that I would acquire an interest only if I would be paying the same amount for each of my units that he and Mr. Kuik had paid for each of their units. He assured me that would be the case and that he and Mr. Kuik were so enthusiastic that they had invested almost $10,000,000 of their

---

1. While AVC has a good deal to say about the law firm, no claim is made that it engaged in any conduct violative of § 10(b) or Rule 10b–5. On the contrary, according to AVC, papers prepared by the firm revealed to it that defendants' earlier representations were false.

2. Daan Scheer, the author of this portion of the brochure, supplied a somewhat different translation: "(total brought in capital, including existing mortgage of about U.S. $18 million), of which the equity will be US $10 million."

3. These representations, all of which defendants deny having made, were: (1) that the Atrium building was purchased for approximately $18 million when in fact it was purchased for about $13 million; (2) that Kuik and Lenting were paying the same amount as AVC for each per-

centage of their equity investment in Atrium when in fact they were paying little or nothing; (3) that Atrium's equity in the building was approximately $10 million when in fact it was approximately $5 million; (4) that Kuik and Lenting intended to limit their fee on resale of the building to 5% of the excess of the sale price over the purchase price when in fact they had no such intention; and (5) that Kuik and Lenting intended to send quarterly, semi-annual and annual reports of Atrium's affairs to all the partners when in fact they had no such intention.

4. Although the outline literally spoke of AVC's purchase of "40% of the Atrium office building", the parties evidently contemplated AVC's acquisition of an interest in the partnership that owned the building.

own money. He repeated that he and Mr. Kuik had purchased the building for $18 million (including the pre-existing mortgage obligation of $8,000,000). He had found three other investors willing to purchase minor interests in Atrium, and it was anticipated that AVC's share in the partnership would be 40%, ten units at $380,000 each. Mr. Lenting explained that when additional investors were found, his share and [Mr. Kuik's] would decrease, but that they intended to keep at least 20% of the partnership equity at a personal cost of $380,000 per unit. Their profit, Mr. Lenting explained, would be earned in fees charged by their management company ... and upon the sale of the Building and liquidation of the partnership.

As a result of the meeting, a civil law notary, B.A.G. van Nievelt,[5] drafted, in Dutch, an "Agreement for Joining General Partnership" (the "Agreement"), which was signed by Lenting and Haan. This began by reciting AVC's desire to become a 40% partner in Atrium by contributing $3,800,000 as capital and Atrium's acceptance of AVC as a partner. It went on to provide that a revised partnership agreement reflecting the participation of AVC and other investors was to be prepared by the Atlanta law firm and that AVC "subjects itself to the provisions of the Partnership as the same have been and shall subsequently be laid down and confirmed" by the firm. AVC was to pay the $3,800,000 at an unspecified date in 1981 to an account of Atrium at a bank at The Hague. AVC agreed to an Advisory Agreement between Atrium and K & L, under which K & L would receive 5% of the monthly gross results of the building and, upon its resale, percentages of the profits ranging upwards, on a sliding scale, from 10% on the first 10% to 25% on profits in excess of 30%.[6] AVC also agreed to subject itself to a supplemental Dutch partnership to be prepared by four civil law notaries (including van Nievelt) that would take into consideration the fiscal advices of Wisselink and the Atlanta law firm. The partnership agreed that AVC should receive "during the years 1981 and 1982 a return upon the basis of US $28,000 per calendar year and during the year 1983 US $30,400." Penalties were provided for AVC's failure to make the required payment. The Agreement concluded with a Final Provision, the pertinent parts of which are as follows:

2. All and any disputes, differences or questions arising from the present Agreement shall be decided and determined by the competent court in Utrecht, unless the Partnership should prefer to proceed according to the standard and normal rules of competency.

3. The laws of the Netherlands shall apply to and govern this agreement.

---

5. An affidavit of Lenting, not contradicted by AVC, states:

Although trained in the law of the Netherlands, notaries are civil servants who act impartially rather than as legal advocates. By having the original form of the contract drawn by a Notary, Mr. Kuik and I attempted to see to it that any agreement we reached with a prospective partner complied with Dutch law and would be binding and enforceable in a Dutch court.

Van Nievelt amplified this in an affidavit of his own:

The role of the civil law notaris is much different from that of a notary public under American law. Notaries are lawyers who also receive special notarial law education, and must serve for a number of years as a candidaat-notaris in the office of a notary. The number of notaries is fixed by law and one's appointment (by the crown) is until the age of

65. The profession of notaris is governed by a special law, the Wet Op Het Notarisamb. Under Dutch law certain acts can only be performed by a notaris. These include: conveyance of real estate, founding of certain companies, creation of mortgages and execution of last wills. It is common for a notaris to be involved in certain activities in which his participation is not mandatory, since the presence of the notaris provides a disinterested advisor and witness who can help resolve potential problems and, if need be, give testimony if disputes should later arise among the parties. Such testimony by an attending notaris is afforded great weight by Dutch courts.

6. AVC was thus fully informed that the promoters were not limiting themselves to a 5% fee on resale, as allegedly had been represented, see note 3, *supra*.

After executing the Agreement, AVC paid into the Atrium account in the Netherlands a total of some $3,100,000 between December 1981 and May 1982 on a schedule roughly tracking the outline Lenting had prepared in Atlanta; as contemplated by that outline the bulk of these payments was loaned to AVC by a Dutch bank. Thereafter AVC failed to make further payments or to sign the revised partnership agreement prepared by the Atlanta law firm.

On June 7, 1983, AVC filed suit against Atrium, Kuik and Lenting in the Supreme Court of New York, Nassau County, alleging fraud in the sale of its partnership interest and seeking to block Atrium's sale of the building.[7] On July 18, 1983, Atrium instituted a suit against AVC in the court at Utrecht requesting a declaration that AVC was in default and an order that it pay the balance due under the Agreement. AVC brought the instant suit in the Eastern District of New York on August 16, 1983. It filed its answer in the Utrecht suit on December 14, 1983. After calling attention to the pending state and federal actions, it pleaded essentially the same fraudulent acts alleged in the complaint here and contended that these were in violation of Article 1364 of the Dutch Civil Code; it also raised other defenses not here material, reserved the right to file a counterclaim if it did not obtain restitution in the proceedings in this country, and requested the Dutch court, unless it was willing to dismiss Atrium's action, to await the decision in such proceedings before making its own decision.

Defendants moved to dismiss the instant action for lack of jurisdiction over the subject matter under Fed.R.Civ.P. 12(b)(1). The argument on the briefs to the district court dealt not only with subject-matter jurisdiction *proprement dite* but with the forum-selection/choice-of-law provision in the Agreement quoted above. Although he noted the existence of both issues, Judge Wexler discussed only the latter. Holding that the agreement came within the exception to § 29(a) of the Securities Exchange Act recognized in *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), he dismissed the action, and this appeal followed.

## DISCUSSION

### A. *Subject-matter jurisdiction*

■ Appellees request us to affirm the dismissal of the action on the ground of lack of subject-matter jurisdiction, which they argued below but on which the district court did not explicitly rule. They are, of course, entitled to ask this under the rule that an appellee may seek to sustain a judgment on the basis of "any argument that is supported by the record, whether it was ignored by the court below or flatly rejected." 9 Moore, Federal Practice ¶ 204–11[3] at 4–45 (2d ed. 1983) (footnote omitted); *Langnes v. Green*, 282 U.S. 531, 51 S.Ct. 243, 75 L.Ed. 520 (1931); *Dandridge v. Williams*, 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156 n. 6, 25 L.Ed.2d 491 (1970).

■ There is no occasion to consider, on this motion under Fed.R.Civ.P. 12(b)(1), defendants' argument that the interest in Atrium that was offered by AVC was not a "security" within § 3(a)(10) of the Securities Exchange Act and that the district court lacked subject-matter jurisdiction on that account. *See, e.g., Williamson v. Tucker*, 645 F.2d 404, 415–16 (5 Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1945), instructs us that, when the contested basis of federal jurisdiction is also an element of plaintiff's asserted federal claim, the claim should not be dismissed for

---

**7.** AVC filed a notice of *lis pendens* in the state action that would prevent the sale. The parties later stipulated that the *lis pendens* be withdrawn on condition that the proceeds of the sale should be held in escrow pending determination of the action. A Justice of the New York Supreme Court for Nassau County later dismissed the action on the basis of the forum-selection/choice-of-law clause invoked by defendants here. AVC's brief states that it intends to appeal the dismissal to the Appellate Division.

want of jurisdiction except when it "appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." Although we do not here determine whether the general partnership interest is a security, AVC's contentions on this score are neither immaterial nor insubstantial for purposes of *Hood. Cf. Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 545 F.Supp. 1314, 1347–50 (S.D.N.Y.1982); *McConnell v. Frank Howard Allen & Co.,* 574 F.Supp. 781, 784–87 (N.D.Cal.1983); Loss, Fundamentals of Securities Regulation 199 (1983).

Defendants also urge dismissal for lack of subject-matter jurisdiction on the theory that the United States' contacts with the dealings among the various Dutch nationals were so small, in comparison to those of the Netherlands, as to render American securities laws inapplicable. If this issue were arising here for the first time, we might also reject it also as inconsistent with the teaching of *Bell v. Hood, supra.* However, every one of this court's seven major decisions regarding the application of the securities laws to transactions carried out in part in the United States and in part abroad has regarded the issue as one of subject-matter jurisdiction.[8] In view of the established jurisprudence of this circuit, we feel constrained to do likewise.

The present case does not precisely fit under any of the precedents mentioned above. AVC relies primarily on *Leasco, supra* note 8, 468 F.2d 1326, which sustained jurisdiction in a case where some misrepresentations were made in New York and some in England. There, however, the allegedly defrauded purchaser was a wholly-owned subsidiary of an American company whose stock was listed on the New York Stock Exchange. We distinguished a case "where a German and a

Japanese businessman met in New York for convenience, and the latter fraudulently induced the former to make purchases of Japanese securities on the Tokyo Stock Exchange", 468 F.2d at 1338, thereby strongly implying that the fact of misrepresentations in the United States would not alone suffice. This would be *a fortiori* true when, as here, the alleged misrepresentations in this country were an intermediate step in a series that began and ended in the home country of the plaintiff and the defendants, where also the challenged contract was signed and plaintiff's payments were made.

However, the German and Japanese businessmen hypothesized in *Leasco* were dealing in Japanese securities, not American ones. The decisions make clear that foreign citizens are entitled to the benefits of United States securities laws with respect to activity in the United States involving American securities. Plaintiff makes much of our statement in *Vencap, supra,* 519 F.2d at 1017:

We do not think Congress intended to allow the United States to be used as a base for manufacturing fraudulent security devises for export, even when these are peddled only to foreigners.

If defendants had inveigled Haan into coming to the United States, had then made misrepresentations concerning a domestic corporation owning a building in this country and had concluded the transaction here, our cases, notably *Cornfeld, supra* note 8, 619 F.2d at 918–20, would support subject-matter jurisdiction. The instant case differs from the hypothetical in two respects. First, nothing was concluded in the United States; the fraud, if there was one, was consummated in the Netherlands. Second, the issuer of the security was a partnership of two Dutchmen which it was contemplated would be expanded to include AVC and

---

**8.** See *Schoenbaum v. Firstbrook,* 405 F.2d 200, 206–09, *modified on other grounds,* 405 F.2d 215 (1968) (en banc), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1333–39 (1972); *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 984–93, *cert. denied,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975); *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1015–18, (1975); *Fidenas AG v. Compagnie Internationale,* 606 F.2d 5, 9–10 (1979); *IIT v. Cornfeld,* 619 F.2d 909, 918–19 (1980); *Psimenos v. E.F. Hutton & Co.,* 722 F.2d 1041, 1044–45 (1983) (commodity trading).

other Dutch nationals. The issuer, in other words, while nominally American, was really Dutch. While it may be hard to see a meaningful distinction for this purpose between a closed corporation and partnership, both formed in accordance with American law, it is equally hard to see one between a partnership of Dutchmen formed in accordance with Georgia rather than with Dutch law, at least when there is no allegation that the Georgia partnership law was used to take advantage of the plaintiff, or that the partnership, acting through agents other than its constituent partners, Kuik and Lenting, engaged in fraudulent activities.

Although the scales appear to us to be nearly evenly weighted, they tip in favor of subject-matter jurisdiction when we apply the standard endorsed by the American Law Institute in its current revision of the Restatement (Second) of the Foreign Relations Law of the United States (1965). Section 17 of the Restatement (Second), on which we heavily relied in many of the decisions cited in note 8, *supra*, was directed to transnational transactions generally; in contrast, Tentative Draft No. 2 of the revised Restatement, which was tentatively approved in May 1981, contains a separate section, § 416, entitled "Jurisdiction over Securities Transactions", which takes account of developments since 1965. The section contrasts transactions in securities carried out, or intended to be carried out, on a securities market in the United States and other transactions in securities. Section 416(1) states that the former are "subject to United States jurisdiction to prescribe, regardless of the nationality or place of business of the participants in the transaction or of the issuer of the securities." With respect to the latter, § 416(2) says the United States has jurisdiction to prescribe where at least one of the four conditions is met, in this case the fact that "representations are made or negotiations are conducted in the United States in regard to the transactions". However, § 416(2) expressly states that, even as regards such transactions, "the authority of the United States to exercise jurisdiction to prescribe depends on its reasonableness in the light of evaluation under § 403(2)".[9] Analyzing the factors we find factors (a)(i)[10] and possibly (b) pointing in favor of application of § 10(b) and Rule 10b–5, factors (g) and (h) against such application, and most of the other factors inapplicable,

**9.** This provides:
> (2) Whether the exercise of jurisdiction is unreasonable is judged by evaluating all the relevant factors, including:
> (a) the extent to which the activity (i) takes place within the regulating state, or (ii) has substantial, direct, and foreseeable effect upon or in the regulating state;
> (b) the links, such as nationality, residence, or economic activity, between the regulating state and the persons principally responsible for the activity to be regulated, or between that state and those whom the law or regulation is designed to protect;
> (c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;
> (d) the existence of justified expectations that might be protected or hurt by the regulation in question;
> (e) the importance of regulation to the international political, legal or economic system;
> (f) the extent to which such regulation is consistent with the traditions of the international system;
> (g) the extent to which another state may have an interest in regulating the activity;
> (h) the likelihood of conflict with regulation by other states.

The Reporters' Notes to § 416 indicate their belief that this approach is consistent with the decisions of this court and of other courts of appeals.

For another proposal, also deemed by its framers to accord with existing decisional law, see ALI Federal Securities Code § 1905 (1980). The instant transaction would seem to be covered by § 1905(a)(1)(A)(i) making the Code applicable to any offer to sell a security "that occurs within the United States although it is initiated outside the United States".

**10.** We read (a)(ii) as referring to the kind of economic effect described in *United States v. Aluminum Co. of America,* 148 F.2d 416, 443–44 (2 Cir.1945), and in *Bersch, supra,* 519 F.2d at 989, not the general interest of the United States in preventing frauds upon persons located within its borders; that interest would fall under the last clause of (b).

dubious or neutral. Under this standard, we think it reasonable, by a rather slight margin, to apply the statute and rule to the facts in this case.

### B. *The forum-selection/choice-of-law clause*

■ Assuming therefore that the district court could otherwise have exercised jurisdiction, as it seems to have thought, we reach the question whether it was justified in declining to do so because of the agreement that "[a]ll and any disputes, differences or questions arising from the present Agreement shall be decided and determined by the competent court at Utrecht", and that "[t]he laws of the Netherlands shall apply to and govern this agreement."

We begin our discussion by saying that if appellant had argued that the forum-selection clause did not apply to a claim that the Agreement was induced by fraud,[11] we might have entertained some doubt on this score. The clause was indeed more than a jurisdiction-conferring clause which, although providing a plaintiff with a guaranteed forum, does not deprive him of the right to sue in another having personal jurisdiction over the defendant. *See* Gruson, *Forum-Selection Clauses in International and Interstate Commercial Agreements*, 1982 U.Ill.L.Rev. 133, 134–35 & n. 3 (collecting cases). What is not so clear, at least from the English translation, is that the clause included a claim that the Agreement had been induced by fraud as distinguished from a claim relating to the time or manner of performance. In the related area of contracts to arbitrate, courts have drawn some rather nice distinctions. The leading case of *Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F.2d 402 (2 Cir.1959) (Medina, J.), *cert. granted*, 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618, *dis-*

*missed pursuant to stipulation*, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960), held that a clause referring to arbitration "[a]ny complaint, controversy, or question which may arise with respect to this contract that cannot be settled by the parties thereto" was sufficiently broad, as a matter of federal although perhaps not of New York law, to include a claim of fraud in the inducement. However, Judge Medina wrote only two years later in *In re Kinoshita & Co.*, 287 F.2d 951 (2 Cir.1961), that a clause in a charter referring to arbitration "any dispute or difference [that] should arise under this Charter" did not include a claim of fraud in the inducement, although the standard clause recommended by the American Arbitration Association ("Any controversy or claim arising out of or relating to the contract, or the breach thereof") would have done the job, *accord, Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (AAA clause); *cf. S.A. Mineracao v. Utah International Inc.*, 576 F.Supp. 566, 570–73 (S.D.N.Y.1983), *aff'd*, 745 F.2d 190 (2 Cir.1984) ("aris[ing] or occur[ing] under" included claim of fraud in the inducement).[12] Whether choice of law here is a matter we are free to determine, as we believe it to be, see 1A Moore's Federal Practice ¶ 0.325 at 3412 (1983); *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.*, 315 U.S. 447, 465, 62 S.Ct. 676, 682, 86 L.Ed. 956 (1942) (concurring opinion of Justice Jackson), or is to be determined by the choice-of-law rules of New York, the interpretation of a forum-selection and choice-of-law clause in a contract executed in the Netherlands among Dutch nationals and a Georgia partnership composed of Dutchmen will require the application of Dutch law to words in the Dutch language —[a]lle geschillen die uit deze overeen-

---

**11.** The closest AVC came to this was Point II of its brief where it argued that the Agreement was simply an agreement to enter into a more formal agreement—a quite different argument which we regard as unmeritorious.

**12.** The clause in *Scherk v. Alberto-Culver Co., supra,* 417 U.S. at 508 n. 1, 94 S.Ct. at 2451 n. 1,

covered disputes "aris[ing] out of this agreement or the breach thereof" and was deemed applicable to a claim of fraudulent inducement, although there the misrepresentations seem to have been incorporated as warranties in the agreement itself.

komst mochten voortvloeien" and "[o]p deze overeenkomst is Nederlands recht van toepassing." The notary who drew the Agreement submitted an affidavit that the provision selecting the court at Utrecht "as the forum for any litigation between the parties (unless the Partnership selects another forum) constitutes an exclusive vesting of jurisdiction of all disputes relating to or arising from the Agreement"—language sufficiently broad to include a claim of fraud. AVC offered no legal opinion to the contrary. We thus hold the clause to be applicable by its terms.

Analysis of the validity of the forum-selection choice-of-law clause must begin with *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). That case concerned a contract between Zapata, an American corporation based in Texas, and a German corporation, Unterweser, for Unterweser to tow a Zapata oil rig from Louisiana to a point in the Adriatic Sea off Ravenna, Italy. The contract provided that "[a]ny dispute arising must be treated before the London Court of Justice"; there was no express choice-of-law clause. The rig was damaged while in the Gulf of Mexico, and Zapata instituted suit in a district court in Florida. The Fifth Circuit, sitting in banc, affirmed, by a divided vote, the district court's denial of a motion by Unterweser to dismiss. The Supreme Court reversed. Repudiating earlier decisions adverse to forum-selection clauses, the Court upheld the view expressed in Judge Wisdom's dissent in the court of appeals that such clauses "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." 407 U.S. at 10, 92 S.Ct. at 1913 (footnote omitted). "The correct approach", the Chief Justice wrote, "would have been to

enforce the forum clause specifically unless Zapata could clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." 407 U.S. at 15, 92 S.Ct. at 1916. He added that "[a] contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision." *Id.*

It is too plain to require extended discussion that *The Bremen* would require enforcement of the clause here in question if the action were not brought under the Securities Exchange Act. To be sure, the Agreement was not an "international commercial agreement", 407 U.S. at 16, 92 S.Ct. at 1916, in the sense that the Zapata-Unterweser contract was, and there was not the same possibility of the application of the laws of many different jurisdictions. 407 U.S. at 13, 92 S.Ct. at 1915. But other differences argue even more strongly for enforcement. Whereas the Zapata-Unterweser agreement provided an English forum for the determination of a controversy between an American company and a German company concerning a contract prepared in Germany, modified in Texas, and ultimately accepted in Germany, 407 U.S. at 2–3, 92 S.Ct. at 1909, we have here a dispute among three Dutch businessmen arising out of negotiations initiated and concluded in their own country, which they have agreed should be resolved by their own courts and by their own law. There can be nothing "unreasonable and unjust" in enforcing such an agreement; what would be unreasonable and unjust would be to allow one of the three to disregard it.[13]

---

**13.** Compare the affidavit of the civil law notary, to which we have previously referred, opining that,

> even absent the forum selection clause ..., the Dutch courts would have jurisdiction over a claim by one Dutch citizen that another Dutch citizen defrauded him in a business venture, particularly where questioned written and oral representations and the closing

of the deal occurred in the Netherlands. It would deeply offend Dutch notions of sovereignty for the courts of any other nation to assert jurisdiction in such an instance, and the offense would be compounded where the Dutch parties had agreed in advance that Dutch law should govern their relations and a Dutch court should resolve their controversies.

AVC's case therefore rests on the provision in § 29(a) of the Securities Exchange Act that

[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or·of any rule of an exchange required thereby shall be void.

*Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), held that an agreement for arbitration contained in a standard form margin contract between a customer and a large brokerage firm violated a similarly worded provision in § 14 of the Securities Act of 1933. It has been argued that *Wilko* should be restricted to the facts there presented—a contract of adhesion where the purchaser had little or no bargaining power, *see, e.g., Scherk, supra*, 417 U.S. at 512 n. 6, 94 S.Ct. at 2453 n. 6 [14]—and that a distinction, viable in the instant context, can be drawn between § 14 of the Securities Act of 1933 and § 29(a) of the Securities Exchange Act of 1934, *see id.* at 513–14, 94 S.Ct. at 2454. However, we conclude, as did the Supreme Court in *Scherk*, that affirmance is here required without need to consider either of these arguments.

*Scherk* upheld, over a claim based on § 29(a) of the Securities Exchange Act, an arbitration clause [15] in an agreement whereby Alberto-Culver, a Delaware corporation with headquarters in Illinois, whose stock was traded on the New York Stock Exchange, purchased three enterprises, organized under the laws of Germany and Liechtenstein, owned by Scherk, a German citizen residing in Switzerland. Payment was to be made in cash and promissory notes; the court of appeals regarded the latter as securities, 484 F.2d 611, 615 (7 Cir.1973), and this conclusion was not questioned by the Supreme Court. On finding that trademarks which were among the assets of the Scherk enterprises were encumbered "and that their purchase was induced through serious instances of fraudulent representations and omissions by Scherk and his agents within the jurisdiction of the United States", 417 U.S. at 522, 94 S.Ct. at 2458 (dissenting opinion), Alberto-Culver claimed rescission and, when Scherk refused this, began suit in a district court in Illinois. The district court denied a motion by Scherk to dismiss and the court of appeals affirmed on the basis of what it considered the controlling force of *Wilko*, with Judge Stevens dissenting.

Proceeding on the assumption that Alberto-Culver's fraud claim was within the Securities Exchange Act, *see* 417 U.S. at 516 n. 9, 94 S.Ct. at 2455 n. 9, the Supreme Court reversed the court of appeals' refusal to enforce the arbitration clause. It held that the foreign aspects of the transaction implicated "considerations and policies significantly different from those found controlling in *Wilko.*" *Id.* at 515, 94 S.Ct. at 2455. In that case "there was no question but that the laws of the United States generally, and the federal securities laws in particular, would govern disputes arising out of the stock-purchase agreements," *id.*, whereas in *Scherk*, "by contrast, in the absence of the arbitration provision con-

---

**14.** The ALI Federal Securities Code, § 1725(b)(3)(C), would exempt from the rule of *Wilko v. Swan* an advance agreement to arbitrate "between any persons if a court determines, on consideration of their financial and legal sophistication and the relationship between them, that the purposes of this Code do not require" its application. *See generally* Loss, Fundamentals of Securities Regulation 1192–96 (1983).

**15.** The arbitration was to be held in Paris in accordance with the rules of the International Chamber of Commerce. The arbitration clause provided that "[t]he laws of the State of Illinois, U.S.A. shall apply to and govern this agreement,

its interpretation and performance." Neither the court of appeals nor the majority of the Supreme Court discussed whether this provision referred only to the local law of Illinois or also to Illinois' obligation under the Supremacy Clause to respect the Securities Exchange Act—a somewhat recondite matter since the Illinois courts have no jurisdiction over suits to enforce that Act. In any event the Supreme Court majority gave no weight to the provision, presumably for the reasons outlined in *Wilko, supra*, 346 U.S. at 435–37, 74 S.Ct. at 186–88. The point is mentioned in Justice Douglas' dissent, 417 U.S. 532 n. 11, 94 S.Ct. at 532 n. 11.

siderable uncertainty existed at the time of the agreement, and still exists, concerning the law applicable to the resolution of disputes arising out of the contract." *Id.* at 516, 94 S.Ct. at 2455. This is likewise true here; it is highly unlikely that, even apart from the challenged clause, a court in the Netherlands would apply the Securities Exchange Act. The Court pointed out that if Scherk had anticipated Alberto-Culver's bringing suit in the United States, he "might have sought an order in France or some other country enjoining Alberto-Culver from proceeding with its litigation in the United States." *Id.* at 517, 94 S.Ct. at 2456. This also is true here. We assume that Atrium could have included in its complaint in the Netherlands a request that AVC be enjoined from suing in the United States, and there seems to be every reason to suppose, given the forum-selection clause, that such a request would have been honored, whatever effect "the courts of this country might ultimately have granted" to it. After saying that "[t]he exception to the clear provisions of the Arbitration Act carved out by *Wilko* is simply inapposite to a case such as the one before us", *id.*, the Court turned to *The Bremen* and indicated that the rule it was announcing with respect to arbitration should also apply to a forum-selection clause, since "[a]n agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of the suit but also the procedure to be used in resolving

the dispute." *Id.* at 518–19, 94 S.Ct. at 2456–57 (footnote omitted).[16]

The considerations in favor of excepting the forum-selection/choice-of-law clause here at issue from § 29(a) of the Securities Exchange Act are quite as strong as were those for excepting the arbitration clause in *Scherk*. In some respects they are stronger. All the individuals concerned are citizens and residents of the Netherlands, the selected forum, whereas in *Scherk* the plaintiff was American, the defendant was German or Swiss, and the arbitration was to take place in France. Most important, the alleged victim here was Dutch whereas in *Scherk* it was a publicly held American company; indeed, the true victims were "the thousands of investors who are the security holders in Alberto-Culver," 417 U.S. at 526, 94 S.Ct. at 2460 (dissenting opinion), who were surely a subject of greater concern to the United States than a Dutch businessman dealing with his own countrymen. Here there were alleged misrepresentations in the United States—but so there were in *Scherk*, see 484 F.2d at 613; 417 U.S. at 522, 94 S.Ct. at 2458 (dissenting opinion).[17] The only remaining distinction is that here the fraud arose in connection with plaintiff's acquisition of American real estate, represented by an interest in a partnership of Dutch citizens formed in accordance with the laws of Georgia. We fail to see how the interest of the United States in preventing foreigners from perpetrating a fraud on a compatriot in such a transaction is greater than in

---

**16.** Although the point has not been raised here, it is also worth noting the Court's explication of language in *The Bremen* that forum-selection clauses "should be given full effect" when "a freely negotiated private international agreement [is] unaffected by fraud." 407 U.S. at 13, 12, 92 S.Ct. at 1914–15. This means only that "an arbitration or forum-selection clause in a contract is not enforceable if the *inclusion of that clause in the contract* was the product of fraud or coercion." *Scherk, supra,* 417 U.S. at 519 n. 14, 94 S.Ct. at 2457 n. 14 (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)) (emphasis in original).

**17.** It is immaterial under Rule 10b–5 that the misrepresentations in *Scherk* concerned the val-

ue of the consideration given for the securities rather than, as here, the value of the securities themselves. *Ruckle v. Roto American Corp.,* 339 F.2d 24, 27–28 (2d Cir.1964). As was said in *Hooper v. Mountain States Securities Corp.,* 282 F.2d 195, 203 (5 Cir.1960), *cert. denied,* 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961), quoted with approval in *Superintendent of Insurance v. Bankers Life and Casualty Co.,* 404 U.S. 6, 11, 92 S.Ct. 165, 168, 30 L.Ed.2d 128 (1971): "Considering the purpose of this legislation, it would be unrealistic to say that a corporation having the capacity to acquire $700,000 worth of assets for its 700,000 shares of stock has suffered no loss if what it gave up was $700,000 but what it got was zero."

preventing a foreigner from perpetrating a fraud on thousands of innocent American stockholders as in *Scherk.* Justice Douglas urged, in his dissent in *Scherk,* 417 U.S. at 530–31, 94 S.Ct. at 2462–63 that,

> [w]hen a foreign corporation undertakes fraudulent action which subjects it to the jurisdiction of our federal securities laws, nothing justifies the conclusion that only a diluted version of those laws protects American investors.

But the majority held that, on the facts of that case, and despite § 29(a) of the Exchange Act, dilution to the extent of holding American investors to an arbitration clause *was* required. Such considerations apply *a fortiori* to a foreign investor, particularly when the asserted injury has been inflicted by his fellow countrymen and the agreement calls for litigation in their own country. While the United States may have an interest in encouraging foreign investment in American real estate which is furthered by extending the protections of the securities laws to securities issued in such transactions, *Scherk* implies that this interest does not require that foreign investors be allowed to escape from a forum-selection/choice-of-law clause in an agreement executed in their own country with their fellow nationals. That is all we need decide here.

We could now end this opinion if we did not deem it necessary to mention a decision of our own that has not been cited to us, *Indussa Corporation v. S.S. Ranborg,* 377 F.2d 200 (2 Cir.1967) (en banc). This was a libel *in rem* brought by a consignee on a $2600 damage claim against a Norwegian ship that had been found in the Southern District of New York. The shipment, from Antwerp to San Francisco, had been under a bill of lading which contained provisions that if the shipment was subject to the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1300 *et seq.,* as it was, the provisions of that act should govern, but also that

> [a]ny dispute arising under this Bill of Lading shall be decided in the country where the Carrier has his principal place

of business, and the law of such country shall apply except as provided elsewhere herein.

However, § 3(8) of COGSA, 46 U.S.C. § 1303(8), forbade

> [a]ny clause, covenant, or agreement in a contract of carriage ... lessening [the carrier's liability for negligence, fault, or dereliction of statutory duties] otherwise than as provided in this Act.

Overruling *William H. Muller & Co. v. Swedish American Line, Ltd.,* 224 F.2d 806 (2 Cir.), *cert. denied,* 350 U.S. 903, 76 S.Ct. 182, 100 L.Ed. 793 (1955), we held the quoted clause was void. Placing stress on COGSA's use of the word "lessening", we pointed out that,

> [f]rom a practical standpoint, to require an American plaintiff to assert his claim only in a distant court lessens the liability of the carrier quite substantially, particularly when the claim is small. Such a clause puts "a high hurdle" in the way of enforcing liability ..., and thus is an effective means for carriers to secure settlements lower than if cargo could sue in a convenient forum.... A clause making a claim triable only in a foreign court would almost certainly lessen liability if the law which the court would apply was neither the Carriage of Goods by Sea Act nor the Hague Rules. Even when the foreign court would apply one or the other of these regimes, requiring trial abroad *might* lessen the carrier's liability since there could be no assurance that it would apply them in the same way as would an American tribunal subject to the uniform control of the Supreme Court, and § 3(8) can well be read as covering a potential and not simply a demonstrable lessening of liability. ...
> We think that Congress meant to invalidate any contractual provision in a bill of lading for a shipment to or from the United States that would prevent cargo able to obtain jurisdiction over a carrier in an American court from having that court entertain the suit and apply the

160

substantive rules Congress had pre-scribed.

(Citations omitted; emphasis in original).[18]

If there were inconsistency between our decision in *Indussa* and the Supreme Court's later decision in *Scherk*, the latter, of course, must prevail. However, we do not think there is any need to question *Indussa* in order for us to follow *Scherk* in this case. *Scherk* read into § 29 of the Securities Exchange Act an exception suffi-cient to validate arbitration agreements and, by implication, forum-selection and choice-of-law clauses, where the foreign elements of a transaction that comes within the Act are sufficiently meaningful. But there is no possibility of reading a "for-eign" exception into COGSA, whose pream-ble, 46 U.S.C. § 1300, states that it applies only to "a bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea to or from ports of the United States." A "foreign" exception to COGSA would swallow the whole; such an exception to § 29 of the Securities Exchange Act leaves the over-whelming bulk of transactions covered by the Act untouched. *Indussa* thus does not stand in the way of our affirming here, and our decision leaves *Indussa* untouched.

The order of the district court dismissing the complaint is affirmed.

---

**18.** The *Indussa* decision, which applied the rath-er cryptic discussion in *Knott v. Botany Worsted Mills,* 179 U.S. 69, 77, 21 S.Ct. 30, 33, 45 L.Ed. 90 (1900), is approved in Gilmore & Black, The Law of Admiralty 145–46 n. 23 (2d ed. 1975), and in Mendelsohn, *Liberalism, Choice of Fo-* *rum Clauses, and the Hague Rules,* 2 Journal of Maritime Law & Commerce 661 (1971). Gil-more and Black call attention to the notation in *The Bremen, supra,* 407 U.S. at 10 n. 11, 92 S.Ct. at 1913 n. 11, that COGSA was inapplicable in that case.