**John S. ROBY, et al., Plaintiffs,**

v.

**The CORPORATION OF LLOYD'S a/k/a The Society and Council of Lloyd's d/b/a Lloyd's of London, et al., Defendants.**

**No. 91 Civ. 7081 (MEL).**

United States District Court,
S.D. New York.

Aug. 18, 1992.

As Amended Sept. 3, 1992.

Affirmed, —— F.2d ——.

338

Proskauer Rose Goetz & Mendelsohn, New York City (Dale A. Schreiber, Minna Schrag, Steven B. Feigenbaum, Bruce E. Loren, of counsel), for plaintiffs.

Mendes & Mount, New York City (Daniel M. Bianca, Leo W. Fraser, William A. Meehan, Jeff J. Imeri, of counsel), for the "Managing Agents" and their "Chairs of the Board".

LeBoeuf, Lamb, Leiby & MaCrae, New York City (Taylor R. Briggs, Sheila H. Marshall, Mary L.B. Betts, Stephen H. Orel, Louise G. Conway, of counsel), for defendants The Soc., Council and Corporation of Lloyd's and their Individual Internal Members.

Wilson, Elser, Moskowitz, Edelman & Dicker, New York City (Thomas W. Wilson, Jonathan C. Thau, Nicholas J. Conca, Fred N. Knopf, of counsel), for defendants Members Agents.

LASKER, District Judge.

These motions to dismiss the complaint present a knot of venue and arbitration clause questions.

Plaintiffs are American investors who joined insurance syndicates that underwrote policies issued in England through Lloyd's of London. They now allege violations of American securities laws and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c) and (d) (1988 & Supp.1989), by various persons and entities in connection with their decision to join Lloyd's syndicates. Three motions to dismiss have been brought by various defendants,[1] who assert that this court is an impermissible venue for the suit because plaintiffs entered contracts with the defendants that provide for dispute resolution by arbitration in England and/or the English courts. Defendants argue in the alternative that under the doctrine of *forum non conveniens* the suit must proceed in England even if the arbitration and forum selection clauses do not control.

Defendants' motions are granted.

## BACKGROUND

Lloyd's provides a marketplace and rules pursuant to which individual underwriters such as plaintiffs (known as "Names" or "Members") form insurance syndicates, with each Name subscribing to a certain percentage of the risk on policies issued by the syndicates, in return for a certain percentage of premiums paid by the insured. To become Members of Lloyd's (synonymous with "Names"), investors must meet in London with representatives of Lloyd's, and must sign a "General Undertaking" in which they agree to be bound by English law and to have English courts or English arbitration govern all disputes relating to the Names' membership or underwriting activities at Lloyd's. The Names play no active role in the syndicates' operations. Each syndicate is run by a Managing Agent, with a Members' Agent retained by each Name to repre-

sent him or her in dealings with Lloyd's overall and with the syndicates' Managing Agents. Names are exposed to unlimited personal liability for their pro rata share of the obligations of the underwriting syndicates to which they belong, but have no liability for the obligations of their fellow Names.

Plaintiffs are American citizens and are Names who claim to have incurred severe losses on their Lloyd's underwriting. They allege that Lloyd's and their Managing and Members' Agents solicited their investment in syndicates with false representations downplaying the risks and exaggerating the benefits associated with such investments. These actions, according to plaintiffs, violated American securities laws and RICO. They do not allege that the arbitration and forum selection clauses at issue here were fraudulently induced.

The complicated structure of Lloyd's leads to a number of contractual relationships that pertain to the instant motion, all of which have in common that the parties to each agreement submit to arbitration in England and/or the jurisdiction of English courts over all disputes. The General Undertaking by which investors become Names provides, in relevant part:

2.1 The rights and obligations of the parties arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's and any other matter referred to in this Undertaking shall be governed by and construed in accordance with the laws of England.

2.2 Each party hereto irrevocably agrees that the courts of England shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's and that accordingly any suit ... arising out of or

---

1. The moving defendants are (1) the Society, Corporation, Committee and Council of Lloyd's and their individual internal members ("Lloyd's"), which are entities or persons that collectively govern Lloyd's of London; (2) the "Members' Agents"; and (3) the "Managing Agents."

relating to such matters shall be brought in such courts....[2]

Since 1990, when Lloyd's revised the standard agreements between Names and Members' and Managing Agents, each Name also has entered into a "Members' Agent's Agreement" which sets forth the terms of the relationship between Names and Members' Agents. That agreement provides:

16.1 ... [A]ny dispute, difference, question or claim relating to this Agreement which may arise between the Agent and the Name shall be referred at the request of either party to arbitration in London....

19.2 Each of the parties hereby irrevocably submits for all purposes of and in connection with this Agreement to the exclusive jurisdiction of the courts of England.[3]

Since 1990, the Managing Agents' rights and obligations have been defined by two agreements, known as the Agents Agreement and the Managing Agent's Agreement. The Agents' Agreement is between a Members' Agent and a Managing Agent, and contains standard provisions including:

9.1 Any dispute, difference, question or claim relating to this Agreement which may arise between the Members' Agent and the Managing Agent shall be referred at the request of either party to arbitration in London....

11.2 Each of the parties hereby irrevocably submits for all purposes of and in connection with this Agreement to the exclusive jurisdiction of the courts of England.[4]

The Managing Agent's Agreement defines the relationship of a Name and a Managing Agent, although plaintiffs dispute whether any of them in fact are bound by such an agreement. The Managing Agent's Agreement defines the relationship of the Name and the Managing Agent, and provides:

16.1 ... [A]ny dispute, difference, question or claim relating to this Agreement which may arise between the Agent and the Name shall be referred at the request of either party to arbitration in London....

19.2 Each of the parties hereby irrevocably submits for all purposes of and in connection with this Agreement to the exclusive jurisdiction of the courts of England.[5]

Before 1990, the Names' relationship with Members' and Managing Agents was defined by different contracts. The pre–1990 Members' Agent's Agreement contained a forum selection clause stating that any dispute "relating to this Agreement" would be subject to arbitration in England, while the Managing Agents were party to a Syndicate and Arbitration Agreement which provided for arbitration in London of all disputes "in connection with or in relation to the ... Syndicate ... or to its constitution or business."

Defendants move for dismissal based on these agreements, as well as on *forum non conveniens* grounds. Despite plaintiffs' energetic opposition, the motions are granted.

## DISCUSSION

Plaintiffs offer a variety of arguments against enforcing the arbitration and forum selection clauses, among them that the clauses do not cover the subject matter of plaintiffs' claims; that they do not cover all defendants; and that for reasons of public policy or judicial discretion, the clauses should not be enforced even if this dispute falls within their scope.

The Court of Appeals for the Tenth Circuit recently ruled that the exact forum selection and arbitration clauses in question here were enforceable, and affirmed the dismissal of securities fraud claims brought against Lloyd's and Managing and Members' Agents by an American Name. *Riley v. Kingsley*

---

2. Undertaking of lead plaintiff John Roby, dated August 22, 1986, Exhibit C to Joint Appendix to Defendants' Motion to Dismiss, March 25, 1992. According to the complaint, Lloyd's requires all Names to sign identical agreements. Compl. ¶ 19.

3. Affidavit of Anthony Geoffry Cooper, June 2, 1992, Exhibit 6.

4. Cooper Affidavit Exhibit 4.

5. Cooper Affidavit Exhibit 5.

*Underwriting Agencies, Ltd.*, 969 F.2d 953 (10th Cir.1992).[6] That well-reasoned opinion sets forth essentially the considerations that warrant dismissal of this complaint. Moreover, in a briefer treatment, the District Court for the Northern District of Illinois dismissed a similar suit. *See Bonny v. Society of Lloyd's*, No. 91 C 5525, slip op., 1992 WL 317137 (N.D.Ill. May 29, 1992). Nevertheless, because the plaintiffs in this case have raised arguments not treated in these rulings and because suits like these remain fairly novel, it is useful to consider the issues at length.

Four Supreme Court opinions of the last twenty years have addressed forum selection and/or arbitration clauses, and consistently have viewed such clauses favorably, particularly in cases involving international commerce. *See Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); *The Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). The Court has noted that such agreements provide "the orderliness and predictability essential to any international business transaction", and that "[a] parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate these purposes, but would invite unseemly and destructive jockeying by the parties to secure tactical litigation advantages." *Scherk*, 417 U.S. at 516–517, 94 S.Ct. at 2456.

Accordingly, forum selection clauses are to be enforced unless the party opposing enforcement "could clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud and overreaching." *The Bremen*, 407 U.S. at 15, 92 S.Ct. at 1916, 32 L.Ed.2d 513 (1972) (enforcing forum selection clause conferring jurisdiction on English courts, although the American plaintiffs' claim likely was barred by a waiver they had signed that was enforceable under English law but not

under American law). *See also Seward v. Devine*, 888 F.2d 957, 962 (2d Cir.1989) (enforcing forum selection clauses where "no indication that enforcement of the clauses would be unreasonable or unjust"). Although *The Bremen* stressed the likelihood that the forum selection clause was actively negotiated by the parties, *see* 407 U.S. at 13, 92 S.Ct. at 1914–1915, later cases have enforced forum selection clauses even in form contracts where the forum provision was not negotiated. *See Carnival Cruise Lines*, 499 U.S. at —, 111 S.Ct. at 1527.

Arbitration agreements are governed by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, and by the Convention of the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, TIAS 6997, 330 U.N.T.S. 38 (1970) (Convention) (codified at 9 U.S.C. § 201 note). The Act provides:

> [A] contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The Convention, to which both the United States and Great Britain are signatories, provides:

> Each contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship....

Convention Art. II(1). Such agreements "shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams." *Id.* Art. II(2).

In practice, the enforceability of arbitration clauses in international commercial agreements has depended in large part on an analysis similar to that of the forum selection clause cases; in both *Scherk* and *Mitsubishi* the Supreme Court enforced arbitration clauses and relied substantially on *The Bre-*

---

**6.** Unlike this suit, *Riley* did not involve a RICO claim, but its analysis applies fully here.

*men,* a pure forum selection clause case. *See Scherk,* 417 U.S. at 518, 94 S.Ct. at 2456–2457; *Mitsubishi,* 473 U.S. at 629–630, 105 S.Ct. at 3355–3356. The Court in *Scherk* noted, "An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of the suit but also the procedure to be used in resolving the dispute." *Id.* at 519, 94 S.Ct. at 2456. The policy favoring arbitration clauses is so strong in the context of international commercial agreements that they are enforced "even assuming that a contrary result would be forthcoming in a domestic context." *Mitsubishi,* 473 U.S. at 629, 105 S.Ct. at 3355.

### A. *Forum Clauses Govern Plaintiffs' Claims Against Each Defendant*

Plaintiffs argue that by their own terms the clauses in question here cover neither the subject matter of their claims or certain defendants named in this suit. They contend that the forum selection clauses to which they agreed "do not apply to claims under the federal securities laws or RICO," Pl.Br. at 33, because "the clauses are limited either to contract disputes arising under the agreement in which they are contained, or to claims recognized under English law." They contend further that their claims against the Managing Agents should survive for want of evidence that the operative contracts in fact were executed, and because, even if those contracts were executed, they are illusory and therefore unenforceable. Finally, plaintiffs assert that individual officers of the Members' and Managing Agents have not entered any agreements with the plaintiffs, and therefore cannot enforce the forum selection and arbitration clauses.

### 1. *Applicability of Agreements to Various Defendants*

The recent Tenth Circuit decision in *Riley* did not discuss the scope or applicability of the agreements, but was premised on the applicability of the arbitration and forum selection clauses of each agreement to Lloyd's and to the defendant Managing and Members' Agents. *See Riley, supra,* 969 F.2d at 956–57.

Plaintiffs' attempt to identify certain individuals or classes of defendants not covered by the forum selection and arbitration clauses is not persuasive. Although plaintiffs struggle to identify parties somehow involved with Lloyd's with whom plaintiffs have not signed a contract and argue that those parties cannot benefit from the forum selection or arbitration clauses, the import of every contract plaintiffs entered is identical: plaintiffs agreed to submit to English law, English courts and/or English arbitration to resolve any disputes arising from or related to their investment in Lloyd's syndicates. All defendants named in this suit either are protected directly by the clauses or are intended beneficiaries entitled to enforce them.

■ Even if it stood alone, the General Undertaking agreed to by plaintiffs at the time they became members of Lloyd's would reach claims against all defendants. That Undertaking, which apparently was not amended in 1990 and was signed by each plaintiff as a prerequisite of his or her membership in Lloyd's, contains an extremely broad, specific forum selection clause by which plaintiffs agreed "irrevocably ... that the courts of England shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's ...." General Undertaking Clause 2.2. All the defendants in this case are alleged somehow to have duped plaintiffs into becoming Members of Lloyd's, a subject that certainly "relat[es] to the Member's membership of" Lloyd's. Thus even defendants not directly a party to the Undertaking are protected by the plain meaning and intent of the Undertaking, which is to force all claims concerning membership in Lloyd's to be brought in England.

■ It is true that the General Undertaking, unlike the Members' and Managing Agents' Agreements, does not itself contain an arbitration clause, and accordingly cannot provide an independent basis for arbitration in England. However, the very question whether Managing Agents themselves or the officers of Members' and Managing Agents are entitled to enforce arbitration clauses is

itself a question relating to plaintiffs' membership in Lloyd's within the meaning of the General Undertaking, and accordingly must be litigated in England.

Moreover, the plaintiffs' arguments as to the applicability and enforceability of other forum selection and arbitration clauses to specific defendants only are not persuasive. The Managing Agents argue with considerable force that whether or not each plaintiff executed an Agreement with each Managing Agent, the parties nevertheless have sufficiently evinced their mutual intent to be bound directly by the Managing Agent's Agreement arbitration clause, and therefore are obliged to arbitrate their differences in England.

■  Whether or not plaintiffs and the Managing Agents can be said directly and mutually to have agreed to the terms of the Managing Agent's Agreement, the interrelated set of agreements which plaintiffs entered to become Members in Lloyd's establishes in several ways their acceptance of arbitration of disputes with Managing Agents. Plaintiffs do not dispute that they executed the standard Members' Agent's Agreements, in which they authorize their Members' Agents to enter into the standard Managing Agent's Agreement. *See* Members' Agent's Agreement, Cl. 2.2(b), Defendant's Joint App. of April 1, 1992, Ex. B. In turn, the standard Managing Agent's Agreement, which was appended to the Members' Agent's Agreement, includes arbitration clauses. *See* Standard Managing Agent's Agreement, Cl. 6, 9.1, Schedule 3 to Ex. B of Defendants' Joint App. Accordingly, even if they did not enter agreements directly with Managing Agents, they duly authorized Members' Agents to do so on their behalf, and Members' Agents did so.

Names also agreed in Article 1 of the General Undertaking to abide by all Lloyd's byelaws. These include a provision prohibiting Names from underwriting insurance other than pursuant to the terms of the standard agreements, which, as discussed above, contain arbitration clauses.

The conclusion that plaintiffs are bound by the Managing Agent's Agreement is confirmed by the fact that their complaint relies at least in part on that Agreement to define the duties owed them by the Managing Agents. *See* Compl. ¶ 25. It goes without saying that plaintiffs cannot both complain of the failure of Managing Agents to perform duties imposed by a contract and simultaneously protest that they are not bound by the terms of the very same contract.

■  Finally, plaintiffs' objection that the Managing Agents' Agreements are unenforceable as illusory or lacking mutuality of obligations is without merit. The agreement recites real and mutual obligations of each party, such as the Managing Agent's obligations to manage the syndicate, and the Name's financial obligations to the Managing Agent. At the very least, Lloyd's byelaws require both Names and Managing Agents to abide by the terms of the standard agreements, including arbitration clauses, sufficiently obligates each party to the Agreement's terms, and renders the contracts valid.

\*      \*      \*      \*      \*      \*

■  Plaintiffs' arguments that the individually named Chairs of Members' and Managing Agents are not protected by the forum selection and arbitration clauses are even less persuasive. The violations that the Chairs are alleged to have committed are not independent of those alleged to have been committed by the Agents themselves, and all arise out of the Chairs' performance of their duties as employees or officers of entities with whom plaintiffs contracted. Accordingly, even if the Chairs are not parties to the operative agreements (a premise which is in doubt), they benefit from them as much as their employers. *See Scher v. Bear Stearns & Co.*, 723 F.Supp. 211, 217 (S.D.N.Y.1989); *Brener v. Becker Paribas, Inc.*, 628 F.Supp. 442, 451 (S.D.N.Y.1985).

## 2.  *Substantive Scope of Agreements*

Plaintiffs maintain that the Members' and Managing Agents' Agreements cover only contractual disputes concerning the parties' obligations, and have no bearing on securities fraud or RICO claims like those here.

■ It is of course true that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986), and that a party cannot be bound by a forum selection clause that does not reach the dispute at hand. However, arbitration agreements are to be construed "as broadly as possible," *S.A. Mineracao Da Trinidade–Samitri v. Utah Int'l, Inc.,* 745 F.2d 190, 194 (2d Cir.1984), and "arbitration should be ordered unless it may be said with positive assurance that the arbitration clauses is not susceptible of an interpretation that covers the asserted dispute." *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 847 (2d Cir. 1987).

Numerous courts have held fraud claims to be governed by arbitration clauses similar to those here. *See, e.g., Meadows Indem. Co. v. Baccala & Shoop Insurance Services, Inc.,* 760 F.Supp. 1036, 1044–1045 (E.D.N.Y.1991) (fraud claims governed by provision that "any dispute arising out of this contract shall be submitted to a board of arbitration"). *See also S.A. Mineracao, supra,* and *Genesco, supra.* Moreover, as noted above, the Tenth Circuit in *Riley* accepted without discussion that the arbitration and forum selection clauses in question here applied to securities fraud claims, and limited its discussion to whether the provisions were consistent with public policy and were otherwise enforceable. *See Riley, supra,* 969 F.2d at 956–57.

In light of this strong authority, the relevant provisions here must be enforced. The provisions all are broadly stated. The arbitration clauses in the Managing and Members' Agents Agreements apply to "any dispute, difference, question or claim relating to" each agreement. The forum selection clauses provide for exclusive English jurisdiction "for all purposes of and in connection with" the agreements. The Syndicate and Arbitration Agreement has the same limitations. The General Undertaking also provides for exclusive English jurisdiction over disputes "arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's."

■ Although the General Undertaking employs different language than the Members' and Managing Agents' Agreements (the latter contain identical forum and arbitration provisions), the latter agreements' relevant clauses do embrace plaintiffs' securities fraud and RICO claims. Claims that defendants deceptively enticed plaintiffs into becoming Names and underwriting insurance at Lloyd's without question "aris[e] out of or relat[e] to [plaintiffs'] membership of" Lloyd's.

■ Plaintiffs claim that because the General Undertaking specifies that it is to be "governed by and construed in accordance with the laws of England," plaintiffs' uniquely American securities fraud and RICO claims do not fall within even the broad forum selection clause of the General Undertaking. However, the mere fact that the parties specify which body of law is to govern their future disputes does not imply that the assertion of claims not recognized by that body of law can trump the choice of law provision. That result would eviscerate such provisions. As noted above, the Supreme Court has held arbitration clauses to be enforceable "even assuming that a contrary result would be forthcoming in a domestic context." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 629, 105 S.Ct. 3346, 3355, 87 L.Ed.2d 444 (1985). The rule applies here with equal force, and accordingly the General Undertaking forum selection clause governs plaintiffs' securities fraud claims.

■ Plaintiffs' claims also are a "dispute, difference, question or claim relating to" the relationship and obligations of plaintiffs and their Agents, which is the subject matter of the agreements on which Managing and Members' Agents rely. With regard to this provision, the heart of plaintiffs' argument is:

Because plaintiffs have not alleged breach of contract claims or otherwise asserted claims that require construction of the agreements, their claims under the securities laws and RICO are outside the reach of either clause. Thus, none of plaintiffs' claims under the 1933 Act against the

Members' Agents or Managing Agents arise from the Agents' violations of norms within the agreements. Pl.Br. at 36. However, in shaping their argument plaintiffs have shifted from the language of the agreement itself, which calls for arbitration of disputes "relating to this Agreement," to a more favorable description of disputes that "arise from the Agents' violations of norms within the agreements." The language actually employed in the Agreement in no way suggests that it covers only disputes concerning interpretation of the Agreements' literal terms. Rather, the coverage of all disputes "relating to" the Agreement most fairly can be read at least to include disputes concerning the formation or solicitation of the agreement, as well as concerning its requirements. Accordingly, plaintiffs' claims fall within the scope of the provision.

None of the cases cited by plaintiffs, all of which either involve narrower forum or arbitration provisions or claims that are less relevant to the underlying contract, are to the contrary. A number of these hold that defamation suits are not within the scope of arbitration clauses in commercial contracts entered into by the parties. *See, e.g., Popper v. Monroe,* 673 F.Supp. 1228, 1230–31 (S.D.N.Y.1987) (clause requiring arbitration of "any dispute between the parties" does not cover defamation case with "no material relationship to the contractual relation with the parties"); *McMahon v. RMS Electronics Inc.,* 618 F.Supp. 189, 190–91 (S.D.N.Y.1985) (arbitration clause governing "disputes and claims arising in connection with this Agreement" does not apply to defamation claims). Claims of defamation that did not bear on the formation or execution of the agreement containing the arbitration clause have much less to do with the agreement than does the present dispute, in which plaintiffs' claims result from the solicitation of plaintiffs by defendants to enter to contracts that contain the very arbitration and forum provisions in dispute.

■ Plaintiffs argue, as they did concerning the General Undertaking, that the English choice of law provision found in the Managing and Members' Agent Agreements establishes that the arbitration clauses do not cover securities fraud claims. This claim is rejected as to the Managing and Members' Agents Agreements for the same reason it was as to the General Undertaking.

■ Finally, plaintiffs argue that the language of the arbitration clauses contained in the Members' and Managing Agents Agreements is narrower than that in the General Undertaking or in earlier agreements, and that therefore Lloyd's must have intended to restrict the applicability of those terms. The pre–1990 Members' Agent Agreement, for example, required arbitration of "[a]ny dispute . . . which may arise between the Agent and the Name," whereas after 1990 the contracts only called for arbitration of disputes "relating to" the Agreements.

The new provision may be narrower than its predecessor, but is not as narrow as plaintiffs suggest. Before 1990 the contract purported to require any dispute whatsoever between the parties, whether or not even remotely related to Lloyd's or the agreements, to be arbitrated. After 1990, to be arbitrable a dispute at least had to be "related to" the agreement. However, as discussed above, "related to" is a term that reasonably embraces the present dispute and is not limited to defining the exact requirements of the contract that contains the term in question.

### B. Public Policy Objections to Arbitration and Forum Selection Clauses

Plaintiffs argue that enforcement of the arbitration and forum selection clauses would undermine American securities law and would be contrary to public policy.

#### 1. Arbitrability of Securities Fraud Claims

■ Plaintiffs first argue that the Supreme Court's decision in *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), retains vitality and bars the application of predispute arbitration clauses to securities fraud complaints.

*Wilko* held that arbitration clauses entered into before a securities fraud dispute arose were unenforceable as contrary to public pol-

icy and were void under § 14 of the Securities Act of 1933, 15 U.S.C. § 77a et seq., which voids any "condition, stipulation, or provision binding any person acquiring any security to waive compliance" with the 1933 Act. 15 U.S.C. § 77n. See Wilko, 346 U.S. at 438, 74 S.Ct. at 188–189.

However, Wilko has been flatly overruled. See Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484–485, 109 S.Ct. 1917, 1922, 104 L.Ed.2d 526 (1989) ("Wilko was incorrectly decided and is inconsistent with the prevailing uniform construction of other federal statutes governing arbitration agreements in the setting of business transactions.... [W]e overrule the decision in Wilko ").

The facts as alleged here are controlled by Scherk, supra. The Supreme Court there enforced an arbitration clause in the face of a § 10(b)(5) claim where the arbitration clause was contained in "a truly international agreement." 417 U.S. at 515, 94 S.Ct. at 2455. As noted above, in Scherk the Supreme Court recited the benefits associated with such agreements, and the grave and numerous pitfalls that would be associated with a "parochial refusal by the courts of one country to enforce an international arbitration agreement." 417 U.S. at 516, 94 S.Ct. at 2456. Those observations apply here.

Plaintiffs attempt to portray the present transaction as not "international," and therefore as distinguishable from Scherk. In light of Rodriguez, which enforced an arbitration clause in a securities fraud case that apparently did not involve international commerce, this attempt appears irrelevant. Moreover, if anything, this case is closer to being entirely English than it is to being either international or a domestic American dispute. Plaintiffs went to England to become Members of a distinctively British entity, invested in syndicates operating out of London and entered numerous contracts all of which stated plainly that Lloyd's affairs and plaintiffs' investment would be administered in England and were subject exclusively to English law, English courts and English arbitration. Apparently all and certainly most defendants are British. The sole American elements are the nationality of the plaintiffs and their alle-gation that they were solicited in the United States. In light of the overwhelmingly British cast and subject matter, the location of some negotiations in the United States and the American nationality of plaintiffs does not qualify the agreements as domestic securities contracts. See The Bremen, 407 U.S. at 2–4, 92 S.Ct. at 1909–1910 (agreement international despite extensive negotiation within United States).

### 2. Applicability of the Convention to Lloyd's Arbitration Clauses

Plaintiffs next argue that the international arbitration Convention does not govern the arbitration clauses contained in the relevant Agreements. It may be that even if the Convention did not apply, the agreements nevertheless could remain binding under ordinary contract principles. In any event, none of the three rationales plaintiffs assert for the non-application of the Convention is persuasive.

■ First, plaintiffs maintain that "under § 202 of the [Federal Arbitration Act], which incorporates the Convention, the Convention does not apply to a domestic distribution of securities," Pl.Br. at 72, because the Convention applies only to contracts involving international commerce. See David L. Threlkeld & Co. v. Metallgesellschaft Ltd., 923 F.2d 245, 250 (2d Cir.1991). In support of their position, plaintiffs cite numerous cases under the Convention that involve international sales and other simple transactions.

However, for the reasons recited above, the transactions in question here are international. It follows that the Convention applies.

■ Second, plaintiffs argue that this dispute is not "in respect of a defined legal relationship ... concerning a subject matter capable of settlement by arbitration," Convention Art. II.1, and therefore is not within the scope of the Convention. However, plaintiffs have not demonstrated that this dispute is not "capable of settlement by arbitration." Indeed, in Rodriguez the Supreme Court squarely addressed the arbitrability of securities fraud claims under both the 1933 and 1934 Acts, and held that such claims

were arbitrable. *See Rodriguez,* 490 U.S. at 480–484, 109 S.Ct. at 1919–1922.

■ Finally, plaintiffs argue broadly that any foreign arbitration award would be unenforceable as contrary to American public policy, and that therefore the arbitration clauses should not be enforced. In support, they cite only Justice Douglas' dissent in *Scherk,* which vehemently objected that "nothing justifies the conclusion that only a diluted version of [federal securities] laws protects American investors." 417 U.S. at 531, 94 S.Ct. at 2463. However, the conclusion Justice Douglas was criticizing, was in fact the holding of the case, a result that remains the law and binds the plaintiffs.

## C. Exercise of Judicial Discretion Against Enforcing Arbitration and Forum Selection Clauses

■ Finally, plaintiffs argue that "as a matter of judicial discretion," the forum selection and arbitration agreements should not be enforced because their enforcement would deprive plaintiffs of the protections of securities laws, and would exculpate defendants from asserted securities fraud and RICO violations. Again, however, these precise arguments have been considered and rejected by the Tenth Circuit Court of Appeals in *Riley,* and are not supported by the weight of previous case law.

"The fact that an international transaction may be subject to laws and remedies different or less favorable than those of the United States is not a valid basis to deny enforcement, provided that the law of the chosen forum is not inherently unfair." *Riley,* 969 F.2d at 958. In *Mitsubishi, supra,* the Supreme Court enforced a clause requiring arbitration of an antitrust claim in Japan "even assuming that a contrary result would be forthcoming in a domestic context," and rejected arguments that public policy demanded that American courts refuse to dilute American antitrust law by enforcing the agreements. *See Mitsubishi,* 473 U.S. at 629, 105 S.Ct. at 3355. Similarly, in *AVC Nederland B.V. v. Atrium Investment Partnership,* 740 F.2d 148, 158 (2d Cir.1984) (Friendly, J.), the Court of Appeals for this Circuit enforced a forum selection clause specifying Dutch jurisdiction although it was unlikely that a Dutch court would enforce American securities laws, which were the basis for the complaint. And in *Scherk,* the Supreme Court enforced an arbitration clause governing a securities fraud complaint where, as here, "in the absence of the arbitration provision considerable uncertainty existed ... concerning the law applicable to the resolution" of the dispute, 417 U.S. at 516, 94 S.Ct. at 2455, and where, again as here, a motion to dismiss the complaint for failure to state a securities fraud claim was pending while the arbitration clause question was being decided. *Id.* at 516 n. 9, 94 S.Ct. at 2455 n. 9.

Plaintiffs object that under the English causes of action available to them, they must show affirmative misrepresentations by defendants (as opposed to fraudulent omissions) and must make a more difficult showing of fraudulent intent. They also object that rather than the full panoply of American statutory provisions whose violation they have asserted, they will be relegated to mere common law claims and essentially identical statutory claims. They further question the availability of claims against various defendants.

Accepting only for purposes of discussion plaintiffs' description of English remedies that would be available to them, enforcement of the present arbitration and forum selection clauses nevertheless is far from "unreasonable or unjust," and is consistent with the standards governing enforcement of arbitration and forum selection agreements.

The sophistication and fairness of English courts cannot seriously be disputed, and has repeatedly been recognized by American courts, *see, e.g., The Bremen,* 407 U.S. at 12, 92 S.Ct. at 1914, while the arbitration proceeding has not been shown to be biased or incompetent, but has merely been objected to as unlikely to apply American securities laws.

Although English law does not afford the treble damage provisions of RICO or the less rigorous elements of proof of the American securities laws, it does at a minimum offer a full panoply of common law remedies for the alleged behavior underlying all plaintiffs'

claims. These remedies include equitable claims for rescission of fraudulently induced agreements and damages claims for negligent or fraudulent misrepresentation, or "deceit." Plaintiffs have conceded that these remedies are available as to the Managing and Members' Agents, who more directly interacted with plaintiffs than did other defendants, and, upon a ·stronger showing of scienter, as to Lloyd's. In addition, English securities regulations may be enforced against Lloyd's upon application by the government on behalf of a defrauded or misled purchaser of securities. Such remedies afford plaintiffs protection under the law; the English law which they earlier accepted merely is less advantageous than the American law that they now prefer. Under the circumstances, plaintiffs are not entitled to more.

It is undeniable that there exists a considerable American interest in affording investors the protections of our securities laws. However, that interest does not outweigh the strong American and transnational interest in maintaining the predictability and regularity of international commerce that is provided by agreements like those in question here, nor can it overcome plaintiffs' earlier agreement to be bound by English law and English dispute resolution.

   \*     \*     \*     \*     \*     \*

The overwhelmingly English nature of this dispute likely also would warrant dismissal of the action on *forum non conveniens* grounds. In view of the dismissal pursuant to the arbitration and forum selection agreements, however, that question need not be reached.

Defendants' motions are granted. The complaint is dismissed.

It is so ordered.