George R. BAKER, Christine Clawson Brandewie, David J., Kathleen S. and Louis N. Browning, Hunter W. Clawson, Michael L. Conaton, Paul C. Cramer, Burgess L. Doan, Burgess L. Doan, II, Verna Dohme, John H. Finn, III, John W., Robert W., Thomas R. and William T. Hayden, Joseph P. Hayden, Jr., Joseph P. Hayden, III, Fred Kahn, James P., William F. and William H. Plettner, Glenn E. Schembechler, George E. Thurner, Jr., and Allen and Ann Zaring, Plaintiffs–Appellees,

v.

LeBOEUF, LAMB, LEIBY & MACRAE, Donald J. Greene, Sheila H. Marshall, John C. Richardson, John W. Weber, and Jeffrey Mace, Defendants–Appellants.

No. 94–3899.

United States Court of Appeals, Sixth Circuit.

Argued July 30, 1996.

Decided Jan. 31, 1997.

Stanley M. Chesley (briefed), Paul M. De Marco (argued), Waite, Schneider, Bayless & Chesley, Cincinnati, OH, for Plaintiff–Appellee.

Robert G. Stachler (argued and briefed), Taft, Stettinius & Hollister, Cincinnati, OH, for Defendants–Appellants.

Before: GUY, BATCHELDER, and DAUGHTREY, Circuit Judges.

BATCHELDER, Circuit Judge.

The plaintiffs filed this action in the United States District Court for the Southern District of Ohio. The defendants moved to dismiss on grounds of improper venue. *See* FED.R.CIV.P. 12(b)(3). The magistrate judge recommended that the motion be denied, *Baker v. LeBoeuf,* No. C–1–92–718, 1993 WL 662352 (S.D.Ohio Oct. 7, 1993), and the district court denied the motion and certified the venue issue for immediate appeal. *See* 28 U.S.C. § 1292(b). Now before us, the defendants contend that the district court should have dismissed this action for improper venue. This appeal does not concern the merits of the plaintiffs' claims. We AFFIRM the order of the district court.

## I. FACTS AND PROCEDURAL HISTORY

### A. THE COMPLAINT

The plaintiffs, most of whom reside in Ohio, are underwriting members, or "names," of Lloyd's of London. *See generally Allen v. Lloyd's of London,* 94 F.3d 923, 926–27 (4th Cir.1996) (describing Lloyd's); *Shell v. R.W. Sturge, Ltd.,* 55 F.3d 1227, 1228–29 (6th Cir.1995) (same); *Certain Interested Underwriters at Lloyd's v. Layne,* 26 F.3d 39, 41–42 (6th Cir.1994) (same); *Bonny*

v. Society of Lloyd's, 3 F.3d 156, 158–59 (7th Cir.1993) (same); *Hugel v. Corporation of Lloyd's*, 999 F.2d 206, 207 (7th Cir.1993) (same); *Roby v. Corporation of Lloyd's*, 996 F.2d 1353, 1357–58 (2d Cir.1993) (same); *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953, 955–56 (10th Cir.) (same). They aver that defendant LeBeouf, Lamb, Leiby & Macrae ("LeBoeuf"), a New York City law firm, is United States counsel for Lloyd's, including its names residing in the United States ("U.S. Names") and those residing outside the United States, that the individual named defendants were members of the LeBoeuf law firm when this action was filed, and that all of them except John C. Richardson still are.

According to the complaint, LeBoeuf advised U.S. Names, including the plaintiffs, to contact LeBoeuf's New York City office regarding United States tax matters and other questions concerning Lloyd's. Lloyd's required that each plaintiff sign a limited power of attorney ("LPA") to LeBoeuf in a form that Lloyd's prescribed and LeBoeuf prepared. The individual defendants were LeBoeuf attorneys who the LPA named or who acted under the LPA. The plaintiffs say they executed the LPA, intending that it enable LeBoeuf, as a matter of administrative convenience, to perform ministerial acts with respect to United States tax matters. The plaintiffs claim they did not intend or imply that the LPA authorize LeBoeuf to negotiate or agree to any alteration of the tax treatment of the plaintiffs.

Upon becoming names, the plaintiffs accepted a 1980 "Closing Agreement" among Lloyd's, then-existing names, and the Commissioner of Internal Revenue ("Commissioner"). Although this Agreement established the tax treatment for the plaintiffs' earnings and losses, the plaintiffs allege that LeBoeuf, beginning in 1987 and without the plaintiffs' knowledge, negotiated with the Internal Revenue Service ("IRS") with the goal of formulating a Closing Agreement to replace the 1980 Agreement. *See generally* I.R.C. § 7121(a) (1989) ("The Secretary is authorized to enter into an Agreement in writing with any person relating to the liability of such person (or of the person or estate for whom he acts) in respect of any internal revenue tax for any taxable period."). The plaintiffs claim that LeBoeuf falsely or negligently represented to the IRS, or allowed the IRS to believe, that LeBoeuf had authority to negotiate and bind the plaintiffs to a 1990 Closing Agreement.

The complaint further avers that Price Waterhouse, an American accounting firm, conducted a study to assist Lloyd's and LeBoeuf in setting priorities for the new Closing Agreement. The financial information for the study was provided by LeBoeuf. Although, according to the plaintiffs, LeBoeuf received a draft of the study in February 1989, LeBoeuf knew of the contents of the study before 1989. The study concluded that the 1990 Agreement would substantially increase the tax burden on U.S. Names, and therefore reduce both the number of U.S. Names and Lloyd's capital base. The study also concluded that the names would suffer substantial losses for 1988, 1989, and 1990. The plaintiffs allege that although LeBoeuf knew of the Price Waterhouse study, LeBoeuf concealed its contents from the plaintiffs. Acting on their behalf without either actual or implied authority and without the plaintiffs' knowledge, LeBoeuf executed the new Agreement with the Commissioner in April 1990.[1]

Further, the plaintiffs complain that while Price Waterhouse was preparing the study, agents of Lloyd's were telling the plaintiffs they should expect profits in each of those years. The plaintiffs charge that by not conveying the information from the study to the plaintiffs, LeBoeuf prevented them from learning that the representations which agents of Lloyd's had made were false. As it turned out, Lloyd's did suffer losses in 1988 and 1989. Had the plaintiffs learned of the Price Waterhouse study, they could have re-

---

1. The complaint avers that LeBoeuf provided the plaintiffs with a copy of the Price Waterhouse study in May 1992.

signed from Lloyd's in time to avoid some or all of these losses.[2]

The plaintiffs say they learned of the 1990 Agreement in May 1990. Although the new Agreement allows the chairman or deputy chairman of Lloyd's, or the Commissioner, to withdraw the Agreement on 180 days' notice, the Agreement does not allow an individual name to refuse to be bound by it. The plaintiffs claim that they have demanded of the chairman that he withdraw the 1990 Agreement, but that Lloyd's, through Le-Boeuf, has refused to do so. The plaintiffs allege that they have disavowed the 1990 Closing Agreement and have written to the Commissioner, saying that LeBoeuf had exceeded its authority as to them and that they were disavowing the 1990 Agreement.

The three-count complaint alleges fraud, breach of fiduciary duty, and negligent representation/legal malpractice. In Count I, the plaintiffs allege that LeBoeuf, while acting as their fiduciary, deliberately concealed from them and misrepresented to them the facts involving the Price Waterhouse study, the negotiations for the 1990 Agreement, and its impact on them, and, as a result, the plaintiffs were unable to protect their interests and have suffered losses. Count II alleges LeBoeuf breached its fiduciary duty to the plaintiffs by, *inter alia*, simultaneously representing the plaintiffs and parties with interests adverse to the plaintiffs'; by exceeding its authority under the LPA; by deliberately concealing material facts from the plaintiffs and not notifying them of the Price Waterhouse study or of the negotiations leading to the 1990 Agreement; and by disregarding the plaintiffs' instructions to withdraw the 1990 Agreement and instead, acceding to Lloyd's instruction not to withdraw the Agreement. Count III claims LeBoeuf committed legal malpractice in negligently breaching the duty it owed the plaintiffs to protect their interests by keeping them advised of matters that might affect them.

### B. THE MOTION TO DISMISS

The defendants point out that to become a name, each of the plaintiffs was required to sign a contract with Lloyd's called the "Gen-

eral Undertaking." That contract contains a forum selection clause by whose terms each plaintiff "irrevocably agrees that the courts of England shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's and that accordingly any suit, action or proceeding arising out of or relating to such matters shall be brought in such courts...." The defendants claim that this action must be dismissed under FED.R.CIV.P. 12(b)(3), because the forum selection clause prevents the plaintiffs from bringing suit anywhere except in England. They charge that this suit against the American lawyers of Lloyd's is simply an effort to circumvent the forum selection clause and the case law from many United States courts of appeal, including ours, holding that the forum selection clause in the General Undertaking prevents Lloyd's names from suing Lloyd's in American courts. *See, e.g., Shell v. R.W. Sturge, Ltd.,* 55 F.3d 1227, 1229–32 (6th Cir.1995); *Bonny v. Society of Lloyd's,* 3 F.3d 156, 159–63 (7th Cir.1993); *Hugel v. Corporation of Lloyd's,* 999 F.2d 206, 207–11 (7th Cir.1993); *Roby v. Corporation of Lloyd's,* 996 F.2d 1353, 1358–66 (2d Cir.); *Riley v. Kingsley Underwriting Agencies, Ltd.,* 969 F.2d 953, 956–60 (10th Cir.1992); *cf. Allen v. Lloyd's of London,* 94 F.3d 923, 928–32 (4th Cir.1996). The defendants urge us to stop what they believe is, in effect, a sham, asserting that the damages the plaintiffs seek are the damages they would seek if they were suing Lloyd's directly in American courts.

The merits of the plaintiffs' claims are not before us. Our only question is whether the district court was correct when it denied the defendants' motion to dismiss, holding that the forum selection clause in question was valid but that it did not apply to the plaintiffs' action.

### II. DISCUSSION

 The enforceability of a forum selection clause is a question of law that we review *de novo. Shell,* 55 F.3d at 1229 (cit-

---

**2.** Information for 1990 was not available when the plaintiffs filed their complaint.

ing *Bonny,* 3 F.3d at 159; *Riley,* 969 F.2d at 956). We need not consider whether federal or state law applies to this issue, because federal and Ohio law treat forum selection clauses similarly. *Id.* (citing *General Elec. Co. v. G. Siempelkamp GmbH & Co.,* 29 F.3d 1095, 1098 n. 3 (6th Cir.1994); *Interamerican Trade Corp. v. Companhia Fabricadora de Pecas,* 973 F.2d 487, 488–89 (6th Cir.1992)). Our first inquiry is whether the forum selection clause in the General Undertaking even applies in this action.

Citing *Roby v. Corporation of Lloyd's,* 824 F.Supp. 336, 342–43 (S.D.N.Y.1992), *aff'd,* 996 F.2d 1353 (2d Cir.1993), the defendants contend that the district court erred in not recognizing that the question of whether they, as nonsignatories to the General Undertaking, may enforce the Lloyd's membership agreements, is itself a question about the plaintiffs' membership in Lloyd's under the General Undertaking, which the parties must litigate in England. However, *Roby* addresses whether Lloyd's managing agents themselves, or the officers of Lloyd's members or managing agents, to whom the forum selection clause clearly applies, may enforce a particular clause in the General Undertaking. *Roby* has no defendants analogous to Lloyd's American lawyers who seek to enforce the forum selection clause. *See id.*

For the proposition that they are entitled to enforce the forum selection clause, the defendants point out, first, that the General Undertaking defines "Lloyd's" as including "any officer or employee of Lloyd's, any person *in or to whom whether individually or collectively any powers or functions are vested or delegated by or pursuant to the Lloyd's Acts 1871–1982* ...." (emphasis added).[3] Based on this language, the defendants state that the General Undertaking obviously protects persons and entities in addition to

Lloyd's, its officers, and employees, because any contrary reading would, in effect, read out of the definition of Lloyd's the language emphasized above.

Next, Lloyd's Byelaw 9, which was incorporated into the General Undertaking, required each of the plaintiffs to give the LPA specifically to LeBoeuf. Since LeBoeuf had the plaintiffs' LPA, LeBoeuf concludes that it is a "person" in whom Lloyd's has "vested" a "power" and a "function" and to whom Lloyd's has "delegated" "power" under the General Undertaking. Therefore, the defendants say LeBoeuf is "a[ ] person in or to whom ... powers or functions are vested or delegated by or pursuant to the Lloyd's Acts 1871–1982" under the General Undertaking, and is entitled to enforce the forum selection clause. The defendants also say they are direct beneficiaries of the General Undertaking.[4] The district court disagreed, and adopted the magistrate judge's conclusion:

> After carefully reviewing defendants' arguments and the language of the General Undertaking, we do not believe that the signatories to the General Undertaking intended that the forum-selection clauses would govern a dispute between Lloyd's U.S. General Counsel and that [the] law firm's U.S. clients regarding issues of breach of fiduciary duty, negligent representation, and legal malpractice alleged to have occurred during representation of those clients before the United States Internal Revenue Service. *See Hill v. Sonitrol of Southwestern Ohio,* 36 Ohio St.3d 36, 521 N.E.2d 780 (1988).... [D]efendants have failed to establish that they are third party beneficiaries of the General Undertakings in question.[5]

The court further concluded that the power of attorney which the plaintiffs gave LeBoeuf does not transform LeBoeuf into a Lloyd's

---

**3.** The district court considered whether LeBoeuf was a Lloyd's entity. The defendants say this framed the issue incorrectly.

**4.** The Seventh Circuit has held that third-party beneficiary status is not required for someone to benefit from a forum selection clause. *Hugel,* 999 F.2d at 209–10 n. 7.

**5.** Based on this and the following paragraphs in the district court order, the defendants accuse

the district court of becoming "needlessly enmeshed in parochial solicitude" for the plaintiffs' "putative status" as American clients of an American law firm, and not recognizing that the relationship between the plaintiffs and defendants concerns Lloyd's matters and arises from the plaintiffs' membership in Lloyd's.

We find no such "parochial solicitude" in the record.

entity. Relying on *Hugel*, which held that "to bind a non-party to a forum selection clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound[,]" 999 F.2d at 209 (citing *Manetti–Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n. 5 (9th Cir.1988); *Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.*, 709 F.2d 190, 203 (3d Cir.1983)), the court found no such connection in this action. Again quoting the magistrate judge, the court then distinguished *Hugel, Bonny, Roby,* and *Riley* by holding that

> LeBoeuf and its partners are not in a position similar to a Lloyd's entity defendant. . . . Since plaintiffs have raised no other claims against Lloyd's or its related entities, the claims against defendants are not integrally related to any such claims. Furthermore, plaintiffs do not assert that the acts of malpractice were committed by defendants as agents of Lloyd's. Rather, they allege defendants committed these acts as plaintiffs' agents. . . . Finally, defendants have presented no authority that an English court has jurisdiction over this lawsuit between U.S. domiciled parties, the subject matter of which was conduct occurring primarily within the U.S. in regard to U.S. tax laws.

The court specifically distinguished *Riley* by finding that defendant LeBoeuf was "not as closely related to Lloyd's as [were] the Members' Agents, Managing Agents, and other *Riley* defendants who would have little or no function outside the Lloyd's marketplace."

Citing *Hugel*, 999 F.2d at 209 & n. 7, the court held that the "web of agreements" between the plaintiffs and Lloyd's demonstrates no close connection between LeBoeuf and Lloyd's sufficient to require enforcing the forum selection clause in this action.

Finally, the court distinguished *Shell v. R.W. Sturge*, 850 F.Supp. 620 (S.D.Ohio 1993), *aff'd*, 55 F.3d 1227 (6th Cir.1995),[6] by

stating that *Shell* involved claims against Lloyd's and several Lloyd's entities; thus, the *Shell* plaintiffs were similar to those in *Bonny, Hugel, Roby,* and *Riley*. By contrast, this action prays for no recision of the General Undertaking, no damages against Lloyd's or its entities, and no injunction to prevent Lloyd's from drawing on plaintiffs' letters of credit or otherwise enforcing the agreements between Lloyd's and the plaintiffs.

After reviewing the record and the law, we find ourselves in agreement with the district court and hold that the defendants may not enforce the forum selection clause. We recognize the defendants' contention that this action is essentially one to recover the plaintiffs' losses at Lloyd's, but we find no error in the magistrate judge's conclusion, adopted by the district court, that venue is proper in the court below. Whether or not the plaintiffs should prevail on these claims—a question not before us—we conclude that this action may be prosecuted in the district court where it was filed.

### III. CONCLUSION

We AFFIRM the order of the district court and REMAND this action for further proceedings.

---

**6.** Both this action and *Shell* were on Judge Weber's docket in the district court. We issued our *Shell* opinion, affirming Judge Weber's dismissal of that action, after Judge Weber entered his order in this action. In *Shell*, however, we dealt, not with the issue of whether a forum selection clause was applicable in a particular action, but when an applicable forum selection clause con-

trols. *See* 55 F.3d at 1229–30; *see also General Elec. Co. v. G. Siempelkamp GmbH & Co.*, 29 F.3d 1095, 1099 (6th Cir.1994) (defendant foreign corporation invoking forum selection clause); *Interamerican Trade Corp. v. Companhia Fabricadora de Pecas*, 973 F.2d 487, 489–90 (6th Cir.1992) (same).