147 F.3d 118
 Fed. Sec. L. Rep. P 90,223
EUROPE AND OVERSEAS COMMODITY TRADERS, S.A., Plaintiff-Appellant,
v.
BANQUE PARIBAS LONDON, Paribas Global Bond Futures Fund,
Paribas Asset Management Ltd. and John Arida,
Defendants-Appellees.
 Docket No. 96-7900.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 5, 1997.
Decided June 4, 1998.
 
 Richard H. Dolan, New York City (Katherine Oberlies, Schlam Stone & Dolan, of counsel), for Plaintiff-Appellant.
 J. Portis Hicks, New York City (Frederick A. Brodie, Mary Ann Berger, and Marcia Landesman, Winthrop, Stimson, Putnam & Roberts, of counsel), for Defendants-Appellees.
 (Allan A. Capute, Special Counsel to the Solicitor, Securities and Exchange Commission, Washington, DC; Richard H. Walker, General Counsel, Jacob H. Stillman, Associate General Counsel, and Paul Gonson, Solicitor, of counsel), for Securities and Exchange Commission, Amicus Curiae.
 Before WINTER, Chief Judge, OAKES and CABRANES, Circuit Judges.
 OAKES, Senior Circuit Judge:
 
 
 1
 Europe and Overseas Commodity Traders, S.A. ("EOC"), a Panamanian corporation, appeals from a final judgment dismissing EOC's complaint pursuant to a Memorandum-Decision of the United States District Court for the Southern District of New York, Barbara S. Jones, Judge, dated June 19, 1996, as amended June 28, 1996. Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London, 940 F.Supp. 528, 530 n. 1 (S.D.N.Y.1996). EOC's sole business is the investment of its capital in securities and other ventures. It is wholly owned by Alan Carr, a citizen of Canada. Defendant-Appellees are Banque Paribas ("Paribas"), Paribas Global Bond Futures Fund, S.A. (the "Fund"), Paribas Asset Management Ltd. ("PAM"), and John Arida, a U.K. national who works as an account manager in the London, England, office of Paribas. Paribas is a French bank; the Fund is organized under the laws of Luxembourg; and PAM is a Bahamian corporation which manages the Fund.
 
 
 2
 The transaction underlying this dispute is entirely foreign inasmuch as there is no U.S. party, but not, strictly speaking, wholly extraterritorial in that EOC alleges that an offer to sell foreign securities was made over the telephone and facsimile to its sole shareholder and agent, Alan Carr, who was in Florida, and both parties agree that orders to purchase securities were placed from Florida. We therefore address the question whether phone calls and facsimiles to a person on U.S. soil provide enough of a connection to the United States to implicate the registration and fraud provisions of U.S. securities laws, and give us jurisdiction thereunder.
 
 
 3
 EOC's complaint, filed on October 14, 1994, asserts eleven claims. Five are based on federal securities law including the sale of unregistered securities pursuant to Section 12 of the 1933 Act, 15 U.S.C. § 77l(1); sale of securities of an unregistered investment company pursuant to the Investment Company Act of 1940, 15 U.S.C. § 80a-7 et seq.; false and misleading statements pursuant to Section 12 of the 1933 Act, 15 U.S.C. § 77l(2); deceptive practices pursuant to Section 10b of the 1934 Act, 15 U.S.C. § 78j and Rule 10b-5, 17 C.F.R. § 240.10b-5; and control person liability pursuant to 15 U.S.C. § 78t. The remaining claims are based on Florida Blue Sky laws and Florida common law.
 
 
 4
 Defendants, in April of 1995 and prior to any discovery, moved to dismiss the complaint for lack of subject matter jurisdiction, lack of personal jurisdiction over three of the defendants, and forum non conveniens. Although defendants sought permission from the district court also to move for dismissal on the grounds of failure to state a cause of action, the district court ordered the defendants to address only the jurisdictional and forum non conveniens issues. See Order dated March 14, 1995, 94 Civ. 7471 (Batts, Deborah A., Judge ). Paribas submitted declarations from Arida; John Baker, the Compliance Officer of the London branch of Paribas; Pierre Corbiau, Secretary of the Fund; Denis Coulon, Director of PAM; and Andrew Charles Smith, a member of the Bar of England and Wales experienced in the commercial and business law of England. The bank also offered a copy of its Investment Agreement with EOC. EOC submitted a declaration of Carr. After a hearing, the district court requested additional information on factual issues pertinent to the jurisdictional questions. EOC submitted a second Carr declaration, which contradicted in significant respects defendants' factual allegations, and defendants submitted further statements from Baker. Judge Jones issued her decision of dismissal on June 19, 1996. EOC filed notice of appeal on July 19, 1996. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. On July 11, 1997, following oral argument in this case, we invited the Securities and Exchange Commission ("SEC") to submit an amicus curiae brief, which it did on October 9, 1997.
 
 I.
 Facts
 
 5
 The facts of this case, though disputed, are sparse. We nevertheless attempt to sketch them in sufficient detail to provide background for the opinion that follows. In so doing, we state the allegations of the complaint, but also indicate some of the points which the defendants strongly dispute.[1]
 
 
 6
 EOC's account at Paribas was established in London in 1992. The "Non-discretionary Investment Agreement" between EOC and Paribas was executed on October 22, 1992, by EOC directors Ian F. Leger and Herbert W. Marvelly. In this agreement, EOC gave a corporate registration address in Panama and a mailing address in Monaco. The company also represented that its directors' meetings take place in Monaco, and named an agent for service of process in England.
 
 
 7
 In October of 1993, Carr was visiting England, as he often does in the autumn. Arida, on October 7, there informed him that a substantial amount of cash had accumulated in EOC's account, and offered to recommend an attractive investment opportunity for the money. Carr says he expressed interest in the proposal, but explained to Arida that he was preparing to leave for Florida on the 9th and that he would be happy to hear more after his arrival.
 
 
 8
 In a series of telephone conversations which began on October 14, Carr and Arida resumed their discussion of EOC's investment in the Fund as planned after Carr's arrival in Florida. The parties agree that each party initiated at least some of these calls. Carr claims that these conversations with Arida were their first significant discussion of the Fund. Carr also alleges that Arida misled him by conveying the following facts, which EOC now claims are not accurate: (a) the Fund was overseen by Paribas's proprietary trading desk; (b) the investors' capital in the Fund was traded along with Paribas's own capital; and (c) the Fund traded securities based primarily on technical as opposed to fundamental considerations. In reliance on these statements, Carr says that from Florida he ordered EOC's first purchase of shares of the Fund on October 18, 1993. He also alleges that these representations were repeated on the occasion of each of his subsequent six purchases which, together with the October 18 purchase, totaled some $1,800,000. Carr further alleges that the defendants at the time of his initial purchase agreed to provide him with weekly statements of the Fund's net asset value, but concealed from him the true net asset value of the Fund during the period of his later purchases.
 
 
 9
 Arida disputes this version of the events. He claims that his first significant conversation with Carr about the Fund occurred while Carr was still in England. He also asserts that Carr ordered the first purchase of Fund shares from England. In support of Arida's story, Paribas offers a copy of a facsimile transmission, dated October 8, from its London office to the Fund in Luxembourg placing an order for five shares. This transmission, which does not list a purchase price, also does not name Carr or EOC as the party for whom the transaction was made. It does, however, list an account number. Unfortunately, the record does not demonstrate whether the number identifies EOC.
 
 
 10
 EOC counters with a letter sent to Carr by Arida listing October 18 as the day of the first purchase of Fund shares and the number purchased as ten. Paribas explains that the October 8 order for five shares was combined with a second order for five shares, which was placed on October 14, to make the ten shares described in Arida's letter. The bank further explains that a transaction ordered on the 8th would have been valued, or priced, on the 18th, because of Fund Rules. The net asset value per share of the Fund is determined weekly on each Monday that is a bank business day in Luxembourg. Shares of the Fund may only be purchased on such days. Applications to purchase shares must be received in Luxembourg not later than 1:00 p.m. on the second business day preceding a valuation day (presumably most often a Thursday as here). October 8, 1993, being a Friday, any application received on that day would not have been valued on the following Monday, October 11, but would have been required to wait until the next Monday, which was the 18th. Thus, Fund rules require that orders placed on the 8th and the 14th would both be finalized on October 18.
 
 
 11
 Carr, in turn, says that Paribas promised him that these rules would not apply to EOC, because of the large size of its transactions. He also avers that Arida may have misunderstood their preliminary discussion as authorization to buy, or impetuously placed the initial order before Carr had consented to the purchase. Such is the disagreement concerning the date and place of the first purchase. Both parties agree, however, that at least six buy orders were placed by Carr on behalf of EOC from his vacation home in Florida.
 
 
 12
 Sale to O'Brien.
 
 
 13
 Shortly after EOC's first purchase, Carr says he told a Florida acquaintance, Matthew O'Brien, about the Fund, and passed along to him Arida's description of the Fund. There is no statement in the record from O'Brien, so the following facts are drawn from Carr's affidavit. O'Brien, in October of 1993, was a legal alien residing in a house he owned in Florida. He has since become a U.S. citizen. He contacted Paribas on Carr's advice, and, after hearing the same alleged misrepresentations as Carr, invested at least $100,000 in the Fund. Like EOC, O'Brien sustained substantial losses.
 
 
 14
 O'Brien's "Application Form," which is dated October 19, 1993, for the purchase of 3 shares valued at U.S. $87,000, is included in the record. O'Brien there represents his nationality as British, and gives a London address and telephone number. A typed note at the bottom of the form explains "I am presently visiting the United States on business" and lists a mailing address and phone number in Florida. We discuss the significance of O'Brien at the end of the opinion, because the allegations concerning him have little impact on our jurisdiction over EOC's federal claims.
 
 
 15
 District Court Findings.
 
 
 16
 The district court found that O'Brien resided in England at the time of his purchase, that plaintiff EOC's principal place of business was in Monaco, and that the initial purchase of Fund shares occurred on October 8, 1993, a date when both parties agree Carr was still in England. Europe and Overseas, 940 F.Supp. at 532. The court also relied on the sworn statement of Corbiau, Secretary of the Fund, id. at 533, that "[i]nsofar as I am aware, no investor in the Fund is a U.S. citizen or resident." But, because no discovery was conducted, this statement was not confirmed by independent findings.
 
 
 17
 We do not think that the district court needed to conclude, contrary to plaintiff's assertions, that O'Brien resided in England or that the plaintiff's principal place of business was in Monaco. We think that it could have based its holding only on findings that EOC and O'Brien made such representations to Paribas, and, thus, Paribas reasonably trusted that at all times during these transactions the bank was dealing with an English individual and a Panamanian corporation with offices in Monaco.
 
 
 18
 For reasons discussed next, even accepting as true EOC's allegations that the initial offer to sell Fund shares occurred while Carr was in Florida, the transactions between EOC and Paribas did not implicate the prescriptive jurisdiction of the federal securities laws.
 
 II.
 Discussion
 
 19
 Appellant EOC emphasizes in its briefs to this court that the district court did not discuss the claims at the heart of this case: sale of unregistered securities of an unregistered investment company to an individual on U.S. soil in violation of §§ 5 and 12 of the Securities Act of 1933[2] and of the Investment Company Act of 1940. EOC seeks rescission of its purchase and reimbursement of the money it invested in the Fund.
 
 
 20
 A. Registration under the 1933 Act.
 
 
 21
 EOC claims that the same "conduct and effects test," which this circuit applies to determine the extraterritorial scope of the fraud provisions of the federal securities laws, should be applied to determine the appropriate reach of the federal registration requirements. The relevant "conduct," EOC maintains, was the solicitation and sale of unregistered securities in the United States, and the relevant "effect" was the consummation of the sale of unregistered securities to a person within the United States. In other words, EOC appears to argue that any solicitation of unregistered securities within the territory of the United States is within the scope of the registration laws, and thus forbidden, without regard to the identity or nationality of any party.
 
 
 22
 The decided law of this circuit clearly states that the antifraud provisions may reach certain transactions not within the registration requirements of our securities law. Consolidated Gold Fields PLC v. Minorco, S.A., 871 F.2d 252, 262 (2d Cir.1989) ("As we observed in Bersch ... the antifraud provisions of American securities laws have broader extraterritorial reach than American filing requirements.") (citing Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 986 (2d Cir.1975)); see also Bersch, 519 F.2d at 986 ("It is elementary that the anti-fraud provisions of the federal securities laws apply to many transactions which are neither within the registration requirements nor on organized American markets.") (citing Leasco, supra, note 1, 468 F.2d at 1335-37). We therefore reject EOC's assertion that the "same standard" applies to the antifraud and registration laws, if EOC means that the registration and fraud provisions are coextensive. The analysis of jurisdiction to prescribe rules governing foreign transactions is guided by "the nature and source of the claim asserted." See Zoelsch v. Arthur Andersen & Co., 824 F.2d 27, 33 n. 4 (D.C.Cir.1987) (comparing the role of the underlying claim in subject matter jurisdiction analysis to that in other "threshold issues" such as standing).
 
 
 23
 In contrast to the antifraud provisions of the 1934 Act, the SEC has provided some guidance as to the applicability of registration requirement of the 1933 Act to foreign transactions.[3] We turn first to this regulation.[4] However, we acknowledge that our precedent determining the extraterritorial reach of related provisions of the U.S. securities laws may provide some assistance in filling any gaps in the SEC's treatment of the scope of the registration provisions.
 
 
 24
 Under Regulation S, which was issued by the SEC and became effective on May 2, 1990, there are two ways that a sale of securities could fall outside § 5's registration requirement. First, a transaction could be "outside the United States," and, second, it could fall into either one of two exceptions defined by the SEC. As the SEC explained in the statement accompanying the new rule, Regulation S adopts a "territorial approach" to § 5.[5] Offshore Offers and Sales, Securities Act Release No. 33-6863, 55 Fed.Reg. 18306, 18307 (May 2, 1990). It does so by setting out a general rule that offers, offers to sell, and sales of securities made outside the United States are not subject to the registration requirement of § 5, while those within the United States must be registered. 17 C.F.R. § 230.901 (1996). The two so-called "safe harbor" exemptions permit the issuance and resale of securities under certain specified conditions. Offerings and resales meeting these conditions are deemed to take place outside the United States for the purpose of § 5. See 17 C.F.R. §§ 230.903 (issuers), 230.904 (resellers).
 
 
 25
 We first examine the safe harbors to determine if either one clearly applies to this transaction. The issuer safe harbor appears to be the only exemption plausibly available to the Fund. Paribas, acting as an agent for the Fund, distributed shares to the public, bringing the bank within the definition of an issuer. See 17 C.F.R. § 230.903. Two general conditions, however, must be met for either of the safe harbors to apply: first, no "directed selling efforts" may be made in the United States. The release defines "directed selling efforts" as marketing efforts such as mailings or seminars in the United States designed to induce the purchase of securities purportedly being distributed abroad. SEC Release No. 33-6863, 55 Fed.Reg. at 18311. Second, any offer or sale must fit the definition of an "offshore transaction," which requires inter alia that no offer be made to a person in the United States.[6]
 
 
 26
 Given the facts alleged by EOC in this case, we cannot say that the Fund can clearly rely on the issuer safe harbor. EOC says that Arida's representations made over the telephone and facsimile to Carr in Florida resulted in his entering a purchase order on behalf of EOC. This alleged conduct could qualify as either "directed selling efforts" or a forbidden offer to a person in the United States. For example, the SEC explained in its release, "offers and sales to transients in the United States are transactions in the United States and may not be part of an offering relying on the safe harbors of Regulation S." SEC Release No. 33-6863, 55 Fed.Reg. at 18316 n. 115. Although Carr was merely an agent acting on behalf of an offshore corporation with its accounts offshore, we cannot say definitively on a Rule 12 motion that such an agent can never qualify as a "person in the U.S." for the purposes of the safe harbors.
 
 
 27
 A transaction not within either of the safe harbors may still be outside of the United States within the meaning of 17 C.F.R. § 230.901. We believe the purchases by EOC ordered by Carr were such foreign transactions. Proposed versions of Regulation S included a list of factors to be considered in determining whether an offer or sale occurs outside of the United States, but in response to comments on the proposals, the list was deleted in the final version.[7] SEC Release No. 33-6863, 55 Fed.Reg. at 18309. The SEC explained that "[t]he determination as to whether a transaction is outside the United States will be based on the facts and circumstances of each case." Id. Our research has uncovered no case or decision of the SEC construing § 230.901 with respect to transients visiting the United States, so we work on an essentially blank slate.
 
 
 28
 We believe that the conduct and effects test used to determine the reach of the anti-fraud provisions of U.S. securities laws can be adapted to analyze what is outside the specific safe harbors yet still "outside the United States" under Regulation S. The conduct and effects test was developed by the courts in the absence of clear Congressional guidance as to the jurisdictional reach of the antifraud provisions of the securities laws. See Alfadda v. Fenn, 935 F.2d 475, 478 (2d Cir.1991). To discern "whether Congress would have wished the precious resources of the United States courts and law enforcement agencies to be devoted to" such transactions, Bersch, 519 F.2d at 985, courts have looked to the underlying purpose of the anti-fraud provisions as a guide. See, e.g., Schoenbaum v. Firstbrook, 405 F.2d 200, 206 (2d Cir.1968) (finding that extraterritorial application of the 1934 Act was appropriate where necessary to protect American investors), modified on other grounds, 405 F.2d 215 (1968) (en banc). The antifraud provisions are designed to remedy deceptive and manipulative conduct with the potential to harm the public interest or the interests of investors. See H.R.Rep. No. 1838, at 32-33 (1934), reprinted in 1 Alan R. Bromberg & Lewis D. Lowenfels, Bromberg and Lowenfels on Securities Fraud & Commodities Fraud § 2.2(331) (2d ed.1997). In outlining the extraterritorial reach of these provisions, courts have reasoned that Congress would not want the United States to become a base for fraudulent activity harming foreign investors, or "conduct," see Psimenos v. E.F. Hutton & Co., 722 F.2d 1041, 1045 (2d Cir.1983), and that Congress would want to redress harms perpetrated abroad which have a substantial impact on investors or markets within the United States, or "effects." See Schoenbaum, 405 F.2d at 206; Consolidated Gold Fields, 871 F.2d at 261-62. However, because it is well-settled in this Circuit that "the anti-fraud provisions of American securities laws have broader extraterritorial reach than American filing requirements," id. at 262, the extent of conduct or effect in the United States needed to invoke U.S. jurisdiction over a claimed violation of the registration provisions must be greater than that which would trigger U.S. jurisdiction over a claim of fraud. To adapt the conduct and effects test for use in interpreting the registration provisions, we must take into account Congress's distinct purpose in drafting the registration laws.
 
 
 29
 Congress passed the registration provisions "to assure full and fair disclosure in connection with the public distribution of securities." James D. Cox et al., Securities Regulation 45 (1991). Through mandatory disclosure, Congress sought to promote informed investing and to deter the kind of fraudulent salesmanship that was believed to have led to the market collapse of 1929. Id. at 14 (citing H.R.Rep. No. 85 (1933)). The registration provisions are thus prophylactic in nature. Seen in this light, the registration provisions also can be said to aim at certain conduct with the potential for discernible effects. Specifically, the registration provisions are designed to prevent the offer of securities in the United States securities market without accompanying standardized disclosures to aid investors, a course of conduct. This conduct, in turn, has the effect of creating interest in and demand for unregistered securities. To avoid this result, in keeping with Congress's purpose, the registration provisions should apply to those offers of unregistered securities that tend to have the effect of creating a market for unregistered securities in the United States; and by "creating a market" we do not mean to imply that the conduct must be directed at a large number of people.
 
 
 30
 The Commissioner's release accompanying Regulation S, as well as the early version of Regulation S, support the application of this conduct and effects test. The factors originally listed in Regulation S pertaining to when an offer or sale of a security occurs outside the United States largely pertain to efforts to create a market in the United States for unregistered foreign securities. These factors were "the locus of the offer or sale, the absence of directed selling efforts in the United States, and the justified expectation of the parties to the transaction as to the applicability of the registration requirements of the U.S. securities laws." Offshore Offers and Sales, Securities Act Release No. 33-6779, 53 Fed.Reg. 22661, 22661-2 (proposed June 17, 1988). Such a test is also consistent with earlier statements by the SEC about the scope of the registration provisions. See, e.g., SEC Release No. 33-6863, 55 Fed.Reg. at 18308 ("The Commission, however, historically has recognized that registration of offerings with only incidental jurisdictional contacts should not be required."); see also Registration of Foreign Offerings by Domestic Issuers, Securities Act Release No. 33-4708, 1964 WL 3661 (July 9, 1964) (stating that U.S. corporations could safely distribute unregistered securities abroad to foreign nationals, if distribution were effected in a manner that would result in the securities coming to rest abroad); Vizcaya Int'l N.V., SEC No-Action Letter, 1973 WL 11880, at * 4 (Apr. 4, 1973) (extending the position of Release No. 33-4708 to foreign corporations).
 
 
 31
 The nearly de minimis U.S. interest in the transactions presented in the instant case precludes our finding that U.S. jurisdiction exists under the more limited conduct and effect standard appropriate under the registration provisions of the 1933 Act. Under the facts as alleged by EOC, there was conduct in the United States because Arida called Carr here and Carr executed his order here. However, the conduct was not such as to have the effect of creating a market for those securities in the United States. Carr's presence here was entirely fortuitous and personal, and the actual purchaser of shares in the Fund was an offshore corporation without a place of business here.[8] Although the offer or sale of an unregistered security to an agent of a foreign company in the United States may in some cases tend to create a market for the security in the United States, this is not such a case. EOC was conducting no business in the United States through Carr, nor otherwise benefitting from his presence here. Nor did the transaction involve a U.S. broker or other U.S. financial entity. Arida, on his part, did nothing to encourage a market for securities in the United States. He made no calls or solicitations to individuals he had reason to suspect were American citizens or permanent residents in the United States, and he directed no general sales efforts here. Accordingly, we hold that the securities sold to EOC did not fall under the registration requirements of the 1933 Act, and that we therefore lack subject matter jurisdiction over EOC's § 5 claims.
 
 
 32
 Of course, we do not attempt in ruling on this case to provide a set of definitive rules to govern future transactions. Nor do we mean to suggest that standards developed under the anti-fraud provisions may be incorporated wholesale into the registration context. The exact contours of the conduct and effects test, as applied to registration cases, must remain to be defined on a case-by-case basis.
 
 
 33
 B. Investment Company Act of 1940.
 
 
 34
 The SEC has clearly said that compliance with Regulation S does not excuse non-compliance with the Investment Company Act of 1940.[9] See SEC Release 33-6863, 55 F.R. at 18316 n. 108. Section 7(d), which governs the Investment Company Act's application to foreign companies, prohibits any investment company which is not organized under the laws of the United States or of a State to use the means of interstate commerce to offer for sale or sell "in connection with a public offering" any security of which it is the issuer. 15 U.S.C. § 80a-7(d). Section 7(d) by its terms only prohibits public offerings by foreign investment companies (absent receipt of an order from the Securities and Exchange Commission). EOC has not alleged that Fund shares were sold by Paribas in connection with a public offering in the United States, and there is no evidence to support such a claim. There is no evidence of a general solicitation in the United States or that offers were made to persons who were not wealthy, sophisticated investors. See, e.g., Ackerberg v. Johnson, 892 F.2d 1328, 1337 (8th Cir.1989). The defendants were, thus, not subject to the Investment Company Act.
 
 
 35
 C. Antifraud Provisions.
 
 
 36
 As discussed above, the antifraud provisions of the securities laws have been held to reach beyond the registration requirement of the 1933 Act. Our conclusion with respect to registration does not therefore eliminate the possibility that jurisdiction could be found under § 10(b) of the 1934 Act (codified at 15 U.S.C. § 78j) and Rule 10b-5 (17 C.F.R. § 240.10b-5).[10] Congress's power to impose civil penalties for fraud in predominately foreign securities transactions is limited only by the Due Process Clause of the Fifth Amendment. In a long line of decisions stretching back to Schoenbaum, this circuit has recognized that the federal securities laws do not reach this constitutional limit.[11] We have looked for conduct, see, e.g., Leasco, 468 F.2d at 1333-34; effects, see, e.g., Schoenbaum, 405 F.2d at 206-09; or a combination thereof, see, e.g., Itoba, supra, note 1, 54 F.3d at 122, in the United States to arrive at "our best judgment as to what Congress would have wished if these problems [of extraterritorial application] had occurred to it." Bersch, 519 F.2d at 993 (footnote omitted).
 
 
 37
 Perhaps the most difficult cases under the conduct test have concerned activity in the United States that causes, or plays a substantial part in causing, harm to foreign interests overseas. By contrast, as stated above, the effects test concerns the impact of overseas activity on U.S. investors and securities traded on U.S. securities exchanges.[12] See Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull S.A., 606 F.2d 5, 9-10 (2d Cir.1979); Itoba, 54 F.3d at 124. Telephone calls and facsimile transmissions conveying offers to sell securities and investment information could be characterized as either conduct or effects in the United States.[13]
 
 
 38
 If evaluated as an effect, the U.S. interest affected by this transaction is indiscernible for reasons already discussed: the plaintiff is a Panamanian corporation; the individual who placed the purchase orders, and who ultimately suffered any losses, is a Canadian citizen; the securities are not traded on a U.S. exchange; and no effect on a U.S. affiliated company is alleged by EOC. There is, thus, no U.S. entity that Congress could have wished to protect from the machinations of swindlers.[14] Cf. IIT v. Vencap, Ltd., 519 F.2d 1001, 1017 (2d Cir.1975) (declining jurisdiction under the effects test over an allegedly fraudulent sale of foreign securities to a British investment trust with 300 U.S. investors who formed .2% of the trust's fundholders).
 
 
 39
 The analysis becomes somewhat more difficult when we turn to the conduct test. The conduct test in this circuit has been stated in two parts as follows:
 
 
 40
 the anti-fraud provisions of the federal securities laws ... [a]pply to losses from sales of securities to Americans resident abroad if, but only if, acts (or culpable failures to act) of material importance in the United States have significantly contributed thereto; but ... [d]o not apply to losses from sales of securities to foreigners outside the United States unless acts (or culpable failures to act) within the United States directly caused such losses.
 
 
 41
 Bersch, 519 F.2d at 993. Or, alternatively, we have said more simply that activity in the United States that is "merely preparatory" to a securities fraud elsewhere will not implicate our antifraud laws. Itoba, 54 F.3d at 122 (citing Bersch). EOC's allegations do not fit neatly into either of the two categories outlined in Bersch. Clearly, EOC is not a U.S. entity: even were we to look through the Panamanian corporate identity, its owner, a Canadian citizen, is still foreign. Yet, on the other hand, EOC alleges solicitation and sale of securities within the United States, and the second Bersch category is specifically limited to sales outside the United States. EOC's claim, thus, falls in yet another category which, although identified, was not addressed in Bersch: "losses to foreigners from sales to them within the United States." 519 F.2d at 993. EOC's is a novel factual pattern not squarely governed by any of our decisions to date.
 
 
 42
 The facts alleged by EOC, nonetheless, satisfy the requirement that U.S. activity directly cause the harm to the foreign interest, which has in the past been the key element of litigation involving the conduct test. Or, stated in the alternative language we have sometimes used, Arida's communications into the United States were more than "mere preparation" for the fraud. EOC alleges that Arida solicited, offered to sell, and accepted a purchase order for securities from Carr when he was in Florida. Carr also says he relied upon the allegedly misleading information given to him from abroad while he was present in the United States, and such reliance was the direct cause of the loss sustained by EOC. Cf. Fidenas, 606 F.2d 5 (all parties were foreign, and this court declined jurisdiction because conduct in the United States was secondary or ancillary to the alleged fraud). The difficult question raised by EOC's allegations is whether Arida's communications to Carr in Florida may be considered activity within the United States for the purpose of the antifraud provisions of the security laws sufficient to support the jurisdiction of this court under the 1934 Act. We believe that they were not.
 
 
 43
 Although phone calls (or any other communications into the United States) soliciting or conveying an offer to sell securities ordinarily would be sufficient to support jurisdiction, it would be inconsistent with the law of this circuit to accept jurisdiction over this dispute, because the surrounding circumstances show that no relevant interest of the United States was implicated. In other words, a series of calls to a transient foreign national in the United States is not enough to establish jurisdiction under the conduct test without some additional factor tipping the scales in favor of our jurisdiction. Without such added weight, the exercise of prescriptive jurisdiction by Congress would be unreasonable within the meaning of the Restatement of Foreign Relations [hereinafter Restatement] §§ 416(2) and 403 (1987),[15] and is particularly so when the transaction is clearly subject to the regulatory jurisdiction of another country with a clear and strong interest in redressing any wrong. We do not think Congress intended to make the securities laws have such a broad reach or to make U.S. courts available for such suits.
 
 
 44
 In the past, we have found jurisdiction over a predominantly foreign securities transaction under the conduct test when, in addition to communications with or meetings in the United States, there has also been a transaction on a U.S. exchange, economic activity in the U.S., harm to a U.S. party, or activity by a U.S. person or entity meriting redress.[16] All of these factors are absent from EOC's allegations. Avc Nederland B.V. v. Atrium Inv. Partnership, 740 F.2d 148 (2d Cir.1984), which Judge Friendly indicated was a very close case, id. at 154, provides the strongest support of EOC's position, but does not go far enough. Nederland concerned the sale of an interest in a partnership formed by Dutch nationals[17] for the purpose of investing in U.S. real estate. Plaintiff-purchaser was also Dutch. Much of the negotiation during which the alleged misrepresentations were made occurred in the United States, but the deal was concluded abroad. Even though the consummation of the allegedly fraud-tainted sale occurred outside the United States, Judge Friendly's opinion found jurisdiction, after considering the many factors listed in § 403(2) of Tentative Draft No.2 of the current Restatement.[18] Id. Specifically, the opinion found the extent of the activity within the regulating state and the economic activity connecting both the plaintiff and defendants to the United States weighed in favor of jurisdiction. Presumably, although the opinion does not say as much, it considered the U.S. real estate investments, which were the purpose of the partnership and the subject of the alleged fraud, to be economic activity connecting the parties to the United States within the meaning of § 403(2)(b) of the Tentative Draft. In any event, we find Nederland distinguishable for this reason. The sales by Paribas to EOC have no similar connection to the United States: EOC invested in Europe; and Paribas's offices in and any other connections to the United States have no relevance to these transactions. We therefore find that the slight additional factor of economic activity in the United States, which "tipped the balance" in favor of jurisdiction in Nederland, is absent from EOC's case.
 
 
 45
 In this case, there is no U.S. party to protect or punish, despite the fact that the most important piece of the alleged fraud--reliance on a misrepresentation--may have taken place in this country. Congress may not be presumed to have prescribed rules governing activity with strong connections to another country, if the exercise of such jurisdiction would be unreasonable in the light of established principles of U.S. and international law. See Restatement § 403. And, the answer to the question of what jurisdiction is reasonable depends in part on the regulated subject matter. Id. cmt. c. ("[R]egulation by the United States of the labor relations of a foreign vessel that regularly calls on the United States may be unreasonable; regulation of the vessel's safety standards may not be unreasonable.")
 
 
 46
 This case illustrates the kind of circumstances in which it is unreasonable to prescribe rules of conduct with respect to securities fraud, even when a misrepresentation is made in the United States and reliance occurs on U.S. soil. Section 10(b), although it sounds in the common law tort of fraud, is part of a regulatory system that serves the public interest of the United States in much the same way as banking and currency regulations. This apparent purpose of protecting and regulating an entire system led this court to extend, through the use of the effects test, the antifraud provisions of these laws to activity not ordinarily within the "presumptive" scope of legislation. See Equal Employ. Opp. Comm'n v. Arabian American Oil Co., 499 U.S. 244, 248 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991) (legislation presumptively territorial); Zoelsch, 824 F.2d at 31 (same) (collecting cases).[19] The very considerations that have led this court to conclude that Congress meant for the securities antifraud laws to reach beyond our shores to certain fraudulent activities abroad militate against finding subject matter jurisdiction over EOC's complaint. It would be ironic if a foreign party seeking redress in a U.S. court could sidestep the effect requirement by stretching our notions of conduct in the United States to include telephone calls from abroad to an agent/owner of that party here fortuitously. The situation is entirely different from the difficult cases under the conduct test in which a U.S. person or entity is the source of misleading information causing harm elsewhere. The U.S. interest in punishing an English malfeasor working at a French bank branch in London who caused no harm here is not apparent. We therefore hold that the alleged solicitation, offer to sell, and purchases occurring while Carr was present in Florida did not bring this otherwise entirely foreign transaction within the antifraud provisions of U.S. securities law.
 
 
 47
 D. O'Brien's relevance to this appeal.
 
 
 48
 O'Brien is not a plaintiff in this proceeding. Apparently recognizing, however, that if he were, a marginally stronger case for subject matter jurisdiction would be before us, EOC continues to press the facts of O'Brien's case on this appeal as it did in the proceedings below. O'Brien purchased shares in his own name, rather than through an offshore company as did Carr. He also may have been a Florida resident at the time of his purchase, even though he made contrary representations to Paribas. And, O'Brien may not have had a preexisting relationship with Paribas at the time of his purchase, but even this fact is not clear from Carr's declarations. Indeed, we do not even know where O'Brien was at the time he executed his subscription agreement, or from where the agreement was sent. Despite EOC's insistence, we need not decide whether we would have jurisdiction over securities fraud or registration claims brought by O'Brien, because he is not a party to this action. Cf. Fidenas, 606 F.2d at 8 (accepting on appeal a distinction drawn by the district court between subject matter jurisdiction over the claims of individual plaintiffs, on the one hand, and class actions or derivative suits, on the other).
 
 
 49
 Viewed as an effect in the United States for the purpose of our jurisdiction over the fraud alleged by EOC, it is hard to see what O'Brien adds to EOC's position. First, O'Brien told the bank that he was a British subject, residing in London, who could be reached in the United States where he was on business. Thus, from the bank's point of view, he had no more of a connection to the United States than did Carr or EOC. Second, any loss he sustained was isolated; it did not have a significant impact on U.S. markets or investors. We cannot see how he changes the lack of any U.S. interest in the alleged fraud. Similarly, O'Brien adds little to EOC's registration claims: his purchase does not support an inference that the bank offered unregistered securities to a person it knew was a resident or citizen of the United States. And, for the same reason, O'Brien cannot be considered evidence of a U.S. market interest in the Fund. O'Brien's purchase does not, therefore, present any reason to alter our conclusion that the sale to EOC was outside the United States for the purpose of § 5.
 
 Conclusion
 
 50
 The decision of the district court dismissing plaintiff EOC's complaint for lack of subject matter jurisdiction is affirmed.
 
 
 
 [1]
 The district court correctly relied on material outside of the complaint in ruling on the Rule 12(b)(1) motion as it would in considering a motion for summary judgment. Europe and Overseas, 940 F.Supp. at 530 n. 2 (citing Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir.1986) ("Rule 56 is relevant to the jurisdictional challenge in that a body of decisions under Rule 56 offers guidelines in considering evidence submitted outside the pleadings.")). As Justice Scalia noted in his separate opinion in Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49, 68, 108 S.Ct. 376, 387, 98 L.Ed.2d 306 (1987) (Scalia, J., concurring in part and concurring in the judgment), "[i]t is well ingrained in the law that subject-matter jurisdiction can be called into question either by challenging the sufficiency of the allegation or by challenging the accuracy of the jurisdictional facts alleged." (citing inter alia Land v. Dollar, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 1011 n. 4, 91 L.Ed. 1209 (1947)). See also Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 108 (1997) (court may refer to any material in the record to establish its subject matter jurisdiction). However, as this court recently cautioned in Itoba Ltd. v. Lep Group PLC, 54 F.3d 118, 125 (2d Cir.1995), "a plaintiff ... should not be deprived of its day in an American court by a Rule 12(b)(1) order based on erroneous facts...." In a close case, the factual basis for a court's subject matter jurisdiction may remain an issue through trial, and, if and when doubts are resolved against jurisdiction, warrant dismissal at that time. See Leasco Data Processing Equip. Corp. v. Maxwell, 468 F.2d 1326, 1330 (2d Cir.1972)
 
 
 [2]
 Section 12 of the 1933 Act, 15 U.S.C. § 77l, creates civil liability for any person who offers or sells a security in violation of § 5 of the Act, 15 U.S.C. § 77e
 
 
 [3]
 We, of course, honor an agency's reasonable interpretation of a statute that Congress has entrusted the agency to administer. See, e.g., Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984); see also Henry P. Monaghan, Marbury and the Administrative State, 83 Colum. L.Rev. 1 (1983) (legitimizing judicial deference to agency constructions of federal statutes in light of the doctrine of the separation of powers) ("[A court] would be violating legislative supremacy by failing to defer to the interpretation of an agency to the extent that the agency had been delegated law-making authority." Id. at 28.)
 
 
 [4]
 Although our analysis below is attentive to specific SEC regulations, it is nonetheless distinct from consideration of the merits. In this motion to dismiss for lack of subject matter jurisdiction, the only issue is whether the registration requirement of § 5 conceivably applied with respect to the parties who are resisting its application. If it does not, the parties' conduct was outside the prescriptive jurisdiction of the United States. See Bell v. Hood, 327 U.S. 678, 682-83, 66 S.Ct. 773, 90 L.Ed. 939 (1946) ("[A] suit may sometimes be dismissed for want of jurisdiction where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.") We therefore address only the application of the requirement to this conduct and not any defenses or other issues that might be relevant to the merits
 Section 5 prohibits any person from offering or selling a security in interstate commerce unless it is registered. "The elements of [an] action for violation of Section 5 are (1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale." In re Command Credit Corp., 1995 WL 279776, * 2 (S.E.C. Apr. 19, 1995). Section 12 provides a rescissionary remedy to persons who purchase unregistered securities in violation of § 5. The terms "offer" and "sell" were construed broadly by the Court in Pinter v. Dahl, 486 U.S. 622, 644-47, 108 S.Ct. 2063, 2077-78, 100 L.Ed. 658 (1988), to reach agents for sellers, such as Paribas, though agents for buyers were not discussed.
 
 
 [5]
 The SEC statement explains: "Rule 901(a) is a general statement of the applicability of the registration provisions of the Securities Act. The General Statement provides that any offer, offer to sell, sale, or offer to buy that occurs within the United States is subject to section 5 of the Securities Act, while any such offer or sale that occurs outside the United States is not subject to section 5. The determination as to whether a transaction is outside the United States will be based on the facts and circumstances of each case.... For a transaction to qualify under the General Statement, both the sale and the offer pursuant to which it was made must be outside the United States." SEC Release No. 33-6863, 55 Fed.Reg. at 18309 (footnote omitted)
 
 
 [6]
 The terms "directed selling efforts" and "offshore transaction" are defined with more detail respectively at 17 C.F.R. § 230.902(b) and (i)
 
 
 [7]
 The deleted factors were "the locus of the offer or sale, the absence of directed selling efforts in the United States, the likelihood of the securities sold coming to rest outside the United States, and the justified expectations of the parties to the transaction as to the applicability of the registration requirements of the U.S. securities laws." Offshore Offers and Sales, Securities Act Release No. 33-6779, 53 Fed.Reg. 22661, 22661-2 (proposed June 17, 1988)
 
 
 [8]
 While my colleagues do not agree, the author of this opinion would add that:
 Having chosen to do business through an offshore corporation to avoid taxes and other regulatory burdens, Carr cannot now claim to be an alter ego of EOC. See Carey v. National Oil Corp., 592 F.2d 673, 676 (2d Cir.1979) ("We will not 'pierce the corporate veil' in favor of those who created it.").
 
 
 [9]
 EOC does not address the issue whether there is a private right of action to enforce § 7(d). We assume for the purpose of this appeal, though we by no means hold, that one exists
 
 
 [10]
 The complaint also alleged a violation of the fraud provision of § 12 of the 1933 Act (15 U.S.C. § 77l(2)). Appellant's brief to this court does not advance this provision as a basis for our assertion of jurisdiction apart from § 10(b), or cite us to any case considering § 12 as a distinct basis for asserting jurisdiction over a foreign transaction. Accordingly, we do not address the question, beyond concluding that § 12 does not reach further than § 10(b). As we noted in Securities and Exch. Comm'n v. Texas Gulf Sulphur Co., 401 F.2d 833, 855 n. 22 (2d Cir.1968), the two antifraud provisions share similar language
 
 
 [11]
 The 1934 Act states at § 30(b) that it "shall not apply to any person insofar as he transacts a business in securities without the jurisdiction of the United States, unless he transacts such business in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate to prevent the evasion of this chapter." 15 U.S.C. § 78dd(b). But, the SEC has provided no such guidance for the antifraud provisions of the 1934 Act, leaving the courts to decide the application of § 10(b) with reference to the statute and its purpose and history
 
 
 [12]
 As formulated in Bersch, the effects test concerns sales to "Americans resident in the United States." 519 F.2d at 993. We agree with the opinion expressed by Judge Motley in O'Driscoll v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 1983 WL 1360, * 3 (S.D.N.Y. Sept. 8, 1983) that "the United States would have a greater interest in protecting foreigners residing within its borders than foreigners resident abroad" and that, for this reason, U.S. residence of individual investors--not American nationality--must be the focus of the effects test. See Restatement of Foreign Relations § 416(1)(a)(ii) (1987) ("The United States may generally exercise jurisdiction ... with respect to ... any offer to enter into a securities transaction, made in the United States by or to a national or resident of the United States.") Indeed, as Judge Motley noted, O'Driscoll, 1983 WL 1360 at * 4, since alienage is a protected class under the Constitution, Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), limiting the effects test to citizen investors would be constitutionally suspect. Plaintiff EOC is, however, a foreign corporation, and even Carr was only vacationing in the United States. We see no reason that the U.S. interest in protecting transients, who benefit from the protection of their own national governments, should be as great as that in protecting resident aliens
 
 
 [13]
 See Consolidated Gold Fields, 871 F.2d at 262 (describing the transmittal of offering documents to the United States as an effect); Leasco, 468 F.2d at 1335 ("[W]e see no reason why, for the purposes of jurisdiction to impose a rule, making telephone calls and sending mail to the United States should not be deemed to constitute conduct within it.")
 
 
 [14]
 EOC objects that the motion to dismiss was granted before discovery was permitted to ascertain the extent of U.S. holdings in and losses from the Fund. The extent of U.S. holdings is often relevant to the issue of whether some alleged frauds affected the United States, but we do not think this is such a case. All the alleged fraudulent representations were made by Arida (or others at Paribas) to Carr personally and perhaps also to O'Brien. The misrepresentations concerned the management and investment practices of the Fund which Carr claims induced him to buy an investment that was not in fact within his investment strategy. Thus, these were by no means the sort of public misrepresentations, such as concealment of a large liability or overstating earnings, that would implicate all U.S. holders of Fund shares, and they are therefore not relevant to the fraud claims
 
 
 [15]
 Section 416 of the Restatement addresses "Jurisdiction to Regulate Activities Related to Securities." Subsection (2) of 416 provides:
 Whether the United States may exercise jurisdiction to prescribe with respect to transactions or conduct other than those addressed in Subsection (1) depends on whether such exercise of jurisdiction is reasonable in the light of § 403, in particular
 (a) whether the transaction or conduct has, or can reasonably be expected to have, a substantial effect on a securities market in the United States for securities of the same issuer or on holdings in such securities by United States nationals or residents;
 (b) whether representations are made or negotiations are conducted in the United States;
 (c) whether the party sought to be subjected to the jurisdiction of the United States is a United States national or resident, or the persons sought to be protected are United States nationals or residents.
 Section 403 includes a longer list of generally-applicable factors relevant to the question whether the exercise of prescriptive jurisdiction is reasonable.
 
 
 [16]
 Alfadda v. Fenn, 935 F.2d 475 (2d Cir.1991) (negotiation with and sale to U.S. parties constituted conduct resulting in the consummation of the fraud); Psimenos v. E.F. Hutton & Co., 722 F.2d 1041, 1046 (2d Cir.1983) (misleading pamphlet upon which plaintiff allegedly relied emanated from E.F. Hutton's New York office and fraud was completed by trading domestic futures contracts on a U.S. exchange); IIT v. Cornfeld, 619 F.2d 909, 918-21 (2d Cir.1980) (U.S. issuer of securities and preponderance of U.S. activity); Arthur Lipper Corp. v. Securities and Exch. Comm'n, 547 F.2d 171, 179 (2d Cir.1976) ("[T]he fraud charged by the SEC was perpetrated in the United States by payments from one registered broker-dealer ... to another...."); Leasco, 468 F.2d at 1338 ("[T]he defendants themselves recognized that Leasco, the United States company, remained at all times intimately involved in the transaction; the foreign entity was accepted by both sides as the alter ego of the American.")
 
 
 [17]
 The seller was a partnership of two Dutchmen formed under Georgia law, but the court considered it a Dutch entity. Nederland, 740 F.2d at 154
 
 
 [18]
 Section 403(2) of the Tentative Draft provided: "Whether the exercise of jurisdiction is unreasonable is judged by evaluating all the relevant factors, including:
 (a) the extent to which the activity (i) takes place within the regulating state, or (ii) has substantial, direct, and foreseeable effect upon or in the regulating state;
 (b) the links, such as nationality, residence, or economic activity, between the regulating state and the persons principally responsible for the activity to be regulated, or between that state and those whom the law or regulation is designed to protect;
 (c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;
 (d) the existence of justified expectations that might be protected or hurt by the regulation in question;
 (e) the importance of regulation to the international political, legal or economic system;
 (f) the extent to which such regulation is consistent with the traditions of the international system;
 (g) the extent to which another state may have an interest in regulating the activity;
 (h) the likelihood of conflict with regulation by other states."
 Nederland, 740 F.2d at 154 n. 9.
 
 
 [19]
 After adopting the Second Circuit's "conduct" test for the extraterritorial application of U.S. securities fraud laws, Judge Bork's opinion in Zoelsch noted "the test we adopt here does provide jurisdiction whenever any individual is defrauded in this country, regardless of whether the offer originates somewhere else, for the actual consummation of securities fraud in the United States in and of itself would constitute domestic conduct that satisfies all the elements of liability." Zoelsch, 824 F.2d at 33 n. 4. We agree with this general statement, but think it inapplicable when, as here, there is no U.S. citizen, resident or other identifiable U.S. interest concerned